IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

MIGUEL ÁNGEL COTTO-VÁZQUEZ
AND MELISSA GUZMÁN-QUIÑONES

Plaintiffs,

v.

UNITED STATES OF AMERICA

Defendant.

CIV. NO.: 16-2807 (SCC)

**OMNIBUS OPINION AND ORDER**

Pending before the Court are cross-motions for summary judgment filed by Miguel Ángel Cotto-Vázquez ("Plaintiff Cotto-Vázquez") and Melissa Guzmán-Quiñones (collectively, "Plaintiffs") and the United States of America ("Government"), pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), *see* Docket Numbers 101 and 105, in addition to the Government's Motion to Exclude the Testimony and Report of Robert Misey ("Motion to Exclude"), *see* Docket Number 98. For the reasons set forth below, the Plaintiffs' Partial Motion for Summary Judgment at Docket Number 101 and the Government's Motion for Summary Judgment at Docket Number 105 are **DENIED** while the Government's Motion to Exclude at Docket Number 98 is **GRANTED.**

## I.  Background

Plaintiffs filed the instant tax refund suit against the Government[1], the Commissioner of the Internal Revenue Service and the Internal Revenue Service ("IRS"), for alleged

---

[1] The Original Complaint was filed on October 7, 2016. *See* Docket No. 2. On April 27, 2019, Plaintiffs filed an Amended Complaint. *See* Docket No. 26. The Government, in representation of the other named defendants, answered both. *See* Docket Nos. 20 and 27. First, the Court points out that because the Amended Complaint supersedes the Original Complaint, the Court will only refer to the Amended Complaint and the Answer to the Amended Complaint throughout this Opinion and Order. Second, the Court recognizes that as its "First Defense" the Government argued that the Commissioner of the Internal Revenue Service ("Commissioner") and the Internal Revenue Service "IRS" were not proper party defendants in view of 26 U.S.C. § 7422(f), which states that a tax refund suit, such as the one before this Court, "may be maintained only against the [Government] and not against any officer or employee of the [Government] (or former officer or employee) or his personal representative." The Government has subsequently filed various motions stating that it was doing so "as the real party in interest and in place of the named federal defendants the [Commissioner] and the [IRS][.]" Docket No. 29 at pg. 1; *see also* Docket Nos. 30 and 52. Moreover, the motion for summary judgment pending before the Court, at Docket Number 105, was filed only by the Government with no mention as to the IRS or the Commissioner. The Government also unilaterally altered the caption of the pleadings such that only the Government appears. The Court hereby confirms that the Government was served in connection with this action, *see* Docket Number 14, and that the Government—not the Commissioner or the IRS—is the proper defendant in this action.

overpaid penalties and income tax assessed for tax years 2006 through 2008. *See* Docket No. 26. In their Amended Complaint, Plaintiffs set forth three causes of action. Under Count I, Plaintiffs request a refund in connection with alleged overpaid penalties which were assessed by the IRS pursuant to 26 U.S.C.A. § 6651(a)(2) for failure to pay income taxes for tax years 2006 through 2008.[2] *See* Docket No. 26 at pgs. 11-13. Counts II and III are intertwined inasmuch as they reject the IRS's determination that the income derived from eight professional boxing bout agreements ("Bout Agreements")— which Plaintiff Cotto-Vázquez  entered into with Top Rank, Inc. ("TR")—was characterized as entirely United States

---

[2] In the Amended Complaint Plaintiffs' request for refund of penalties also included the penalties charged due to the late filing of their 2006 and 2007 tax returns pursuant to 26 U.S.C.A. § 6651(a)(1) as well as penalties for failure to make estimated tax payments in connection with tax years 2006, 2007 and 2008 under 26 U.S.C.A. § 6654(a). *See* Docket No. 26 at pgs. 11-13. However, said request for refunds were waived by Plaintiffs in their Opposition to the Government's Motion for Summary Judgment. *See* Docket No. 122 at pg. 15. As such, the only pending request for refund concerning penalties is as to the penalties assessed for late payments regarding tax years 2006, 2007 and 2008.

source income.[3] Specifically, Count II entails a request for refund for supposed overpaid income taxes regarding personal services purportedly performed by Plaintiff Cotto-Vázquez pursuant to the Bout Agreements. *Id.* at 13-20. Plaintiffs reason that, because Plaintiff Cotto-Vázquez allegedly rendered personal services in connection with the Bout Agreements in Puerto Rico, the income earned for such services should not have been categorized as United States source income, but rather, they should have been deemed as Puerto Rico source income. *Id.* Therefore, Plaintiffs contend they are entitled to a refund of $973,376.00 for overpaid income taxes. *Id.* at pg. 23.

Similarly, under Count III, Plaintiffs seek a refund in the amount of $1,084,875.00 for the alleged overpayment of income taxes in relation to the purported sale of Plaintiff Cotto-Vázquez's intangible property rights as defined in the Bout Agreements under the "Ancillary Rights" provision. *Id.*

---

[3] The income derived from the Bout Agreements will be referred to as the "Agreement Income" throughout this Opinion and Order.

at pgs. 20-24. Plaintiffs allege that the Bout Agreements included the sale of Plaintiff Cotto-Vázquez's intangible property rights. *Id.* Plaintiffs reasoning follows that, any gain from Plaintiff Cotto-Vázquez's sale of his intangible property rights such as his name, image and likeness in Puerto Rico is Puerto Rico source income and not United States source income. *Id.* In the alternative, if the Court were to find that the Bout Agreements did not provide for the sale of Plaintiff Cotto-Vázquez's intangible property rights, Plaintiffs ask the Court to consider a claim for refund for overpayment of income taxes in the amount of $379,761.21, plus interest, pursuant to the proposition that the compensation received in consideration for the exploitation of Plaintiff Cotto-Vázquez's intangible property rights in Puerto Rico be considered a license. *Id.*

## II. Cross-Motions for Summary Judgment

On March 2, 2020, the parties filed cross motions for summary judgment.[4] While Plaintiffs filed a Partial Motion

---

[4] The parties filed multiple requests for extensions of time in order to fully brief the motions due to the COVID-19 pandemic. *See* Docket Nos. 109,

for Summary Judgment as to Counts I and III at Docket Number 101 ("Plaintiffs' Partial Motion for Summary Judgment"), the Government filed what the Court reads as a full motion for summary judgment as to all three Counts at Docket Number 105 ("Government's Motion for Summary Judgment"). Oppositions followed.[5] *See* Docket Nos. 122 and 124.

---

118, and 120. The Court granted these requests. *See* Docket Nos. 114, 119 and 121.

[5] The Government filed a motion for leave to file a reply in support of its motion for summary judgment. *See* Docket No. 125. Plaintiffs moved to strike the motion for leave. *See* Docket No. 126. According to Plaintiffs, the Government's proposed reply did not consider or discuss new issues of fact or law, for the matters addressed in the proposed reply brief had been previously discussed in the Government's motion for summary judgment at Docket Number 122. *Id.* at pg. 2. Furthermore, the proposed reply did not comply with Local Rule 56(d) because it was not accompanied by a separate statement of material facts addressing the additional facts included by Plaintiffs in their statement of facts at Docket Number 122. *Id.* The Government did, however, file a Motion for Leave to File Reply Statement of Facts *Nunc Pro Tunc* to comply with Local Rule 56(d). *See* Docket No. 127. The Court denied both motions for leave and found moot Plaintiffs' Motion to Strike. *See* Docket No. 128. While the Court upholds its denial of the proposed reply brief at Docket Number 125, it clarifies that it did consider the reply statement of facts attached to the Government's Motion for Leave *Nunc Pro Tunc* at Docket Number 127-1 for the purposes of discerning the undisputed facts in this case.

### A. Summary Judgment Standard

Summary judgment is proper under Rule 56, when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *See Dunn v. Trs. Of Bos. Univ.,* 761 F.3d 63, 68 (1st Cir. 2014) (internal quotations and citations omitted). Moreover, facts are categorized as "material" when they can potentially "affect the outcome of the suit under the applicable law." *Sánchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996).

The movant bears the initial burden of establishing "the absence of a genuine issue of material fact". *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). But after the movant makes an initial showing that no genuine issues of material fact are present, in order to overcome a motion for summary judgment, the non-movant must demonstrate "through submissions of evidentiary quality, that a trialworthy issue

persists." *See Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). It is worth noting, however, that when the non-movant bears the ultimate burden of proof at trial, the non-movant cannot "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995). Further, while the Court draws all reasonable inferences from the record in the light most favorable to the non-movant, in doing so, it casts aside and ignores all "conclusory allegations, improbable inferences, and unsupported speculation." *See García-García v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (internal quotations and citations omitted).

When faced with cross-motions for summary judgment— as is the case here—the Court need not apply a different standard of review than the one espoused above. *See Adria Int'l Group, Inc., v. Ferré Development., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). The Court need only "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id.* And while each motion for

summary judgment will be decided on its own merits, because both the Government's and Plaintiffs' respective motions for summary judgment were filed simultaneously, the Court will consider both motions at the same time. *See P.R. American Ins. Co. v. Rivera-Vázquez*, 603 F.3d 125, 133 (1st Cir. 2010).

## B.  The Undisputed Facts ("UF")

In order to make its factual findings, the Court considered Plaintiffs' Statement of Material Facts ("PSMF")[6] at Docket Number 102, the Government's Response to Plaintiffs' Statement of Facts ("GOVERNMENT'S RESPONSE SMF") at Docket Number 124-1, the Government's Statement of Undisputed Material Facts ("DSUMF") at Docket Number 105-2, Plaintiffs' Opposing Statement of Material Facts

---

[6] Plaintiffs' PSMF was riddled with what the Court will refer to as "compounded" proposed facts. These are proposed facts which include a statement and one or more deposition testimony extracts. While making its findings of fact, there were times in which the Court cited to a proposed fact but only admitted either the statement portion or the deposition testimony. As noted throughout this Opinion and Order, the Court's reasoning was explained when faced with this situation.

("PLAINTIFFS' OPPOSING SMF") at Docket Number 123, Plaintiffs' Additional Facts ("PLAINTIFFS' ADDITIONAL SMF"), also at Docket Number 123, and the Government's Reply to Plaintiffs' Additional Facts ("GOVERNMENT'S REPLY TO PLAINTIFFS' ADDITIONAL SMF") at Docket Number 127-1, in tandem with the documentation cited and attached thereto in accordance with Local Rule 56(e).

After examining the aforementioned, and having disregarded legal arguments and conclusory statements[7] the Court finds that the following facts are undisputed:

### i. General

1.      During the tax years 2005, 2006, 2007 and 2008 (the "Tax Years") Plaintiffs were—and are still—legally married and bona fide residents of Caguas, Puerto Rico. PSMF ¶ 1.

2.      Plaintiff Cotto-Vázquez is a highly decorated boxer who achieved numerous boxing titles throughout his amateur

---

[7] *See Cruz-Acevedo v. Toledo-Dávila,* 660 F. Supp. 2d 205, 209 (D.P.R. 2009) (clarifying that "[a]s a general principle, parties may not include legal arguments or conclusions in their statement of facts.") (internal citations omitted).

and subsequent professional boxing career.  PSMF ¶¶ 2-3.

3.     During  the  Tax  Years,  Plaintiff  Cotto-Vázquez's
main source of income derived from engaging in professional
boxing bouts ("Bouts") and related activities pursuant to the
terms  and  conditions  of  the  Bout  Agreements  entered  into
with TR. PSMF ¶ 4; Docket Nos. 102-5 – 102-12 and 104-1 -104-
8.

## ii.     The Bout Agreements

4.     During  the  Tax  Years,  Plaintiff  Cotto-Vázquez
entered  into  a  total  of  eight  Bout  Agreements  with  TR  for
bouts against: (i) Muhammad Abdullaev, held on June 11,
2005  ("Abdullaev  Bout");  (ii)  Ricardo  Torres,  held  on
September 24, 2005 ("Torres Bout"); (iii) Paul Malignaggi,
held  on  June  10,  2006  ("Malignaggi  Bout");  (iv)  Carlos
Quintana, held on December 2, 2006 ("Quintana Bout"); (v)
Zab Judah, held on June 9, 2007 ("Judah Bout"); (vi) Shane
Mosley, held on November 10, 2007 ("Mosley Bout"); (vii)
Alfonso Gómez, held on April 12, 2008 ("Gómez Bout); and
(viii) Antonio Margarito, held on July 26, 2008 ("Margarito
Bout") (collectively, the "Bouts"). PSMF ¶ 6; Docket Nos. 102-

5 – 102-12 and 104-1 -104-8.

5.     The Bouts took place in the continental United States. PSMF ¶¶ 5-6; Docket Nos. 102-5 – 102-12 and 104-1 - 104-8.

6.     The Bout Agreements included a "Promotional Rights; Rules & Regulations" provision which stated in part that "[Plaintiff Cotto-Vázquez] grants TR and its designees all exclusive rights required to stage the Bout and to sell tickets or admission to the Bout to the public." *See* PSMF ¶ 9; Docket Nos. 102-5 ¶ 2 - 102-12 ¶ 2; 104-1¶ 2 – 104-8 ¶ 2. [8]

---

[8] Plaintiffs' proposed fact at PSMF ¶ 9 included an introductory statement, prior to citing directly to a portion of the "Promotional Rights; Rules & Regulations" provision of the Bout Agreements, which stated that "[a]ccording to the Bout Agreements, [Plaintiff Cotto-Vázquez ] granted to TR all exclusive worldwide rights to the bouts in perpetuity." The Government admitted that Plaintiffs "recitation" of the provision, reflects the content of the Bout Agreements. *See* GOVERNMENT'S RESPONSE SMF ¶ 9. Nonetheless, the Government posits that if by referencing this paragraph "Plaintiffs are making a legal conclusion or [are] suggesting an inference that the compensation was allocated within each bout agreement to rights or services[,]" it must deny such conjectures. *Id*. The Government's denial constitutes a legal argument which the Court will not resolve at this time. However, having said this, the Court has opted to directly quote to the provision in full for that is what it states, and the Government has admitted as much.

7.    The Bout Agreements included an "Ancillary Rights" provision which stated the following:

> [Plaintiff Cotto-Vázquez] grants to TR all exclusive worldwide rights to the Bout in perpetuity. The rights include the unrestricted right to broadcast, telecast, exhibit, photograph, record or otherwise reproduce all or portions of the Bout and the events immediately preceding and following the Bout and between round in any and all media in or by any manner, method or device now known or hereafter devised, including, without limiting the generality of the foregoing, the unlimited and unrestricted right to telecast the Bout by means of live or delayed free over-the-air, cable, subscription, master antenna, multi-point or closed circuit television; pay-per-view television by means of terrestrial, cable, over-the-air, satellite, analog and digital transmission as well as Video On Demand, Near Video on Demand and HDTV, PDAs and other multimedia services; radio; films and tapes, for exhibition in all media and in all gauges, whether for theatrical exhibition or for sale, lease or license for home use, including audio and audiovisual cassettes and discs, CD-ROM, digital video devices ("DVD"), all forms of intent on-line services or deliver, games and toys, and the unlimited right to deal with any or

all of the foregoing, and to obtain copyright or
similar protection in the United States and all
other countries of the world where such
protection is available in the name of TR or TR's
nominees or assignees and all other fights,
privileges, benefits, matters and things incident
to or arising out of all or any of the foregoing,
all in such manner as TR in its sole discretion
shall determine. Further, [Plaintiff Cotto-
Vázquez ] grants to TR all commercial and no-
commercial advertising and publicity uses of
the Bout and portions thereof and [Plaintiff
Cotto-Vázquez 's] image, with respect to which
[Plaintiff Cotto-Vázquez] hereby waives his
personal right of privacy. [Plaintiff Cotto-
Vázquez ] grants to TR the right to use in any
medium the name, likeness and biographical
material of [Plaintiff Cotto-Vázquez], and his
trainers and seconds, for the purpose of
advertising and promoting the Bout and for
advertising and promoting the Ancillary Rights,
as defined herein, including souvenir programs
sold in connection with the Bout or the sale of
said programs at any time thereafter and
including institutional advertising by the site
and TR's television licenses for the Bout. TR and
its licensees or assignees shall have the right to
use the name of [Plaintiff Cotto-Vázquez], his
photograph or other likeness, on commercial

and merchandising tie-ups and advertisements,
banners, buttons, posters, T-shirts, clothing
(such as hats and jackets), jewelry and other
souvenir items, and all similar products, but
only in connection with and expressly related to
the Bout and the Ancillary Rights. All of the
rights, privileges and benefits granted by
[Plaintiff Cotto-Vázquez] to TR pursuant to this
paragraph 3 are hereinafter referred to as the
'Ancillary Rights.'

*See* PSMF ¶ 9; Docket Nos. 102-5 ¶ 3 - 102-12 ¶ 3; 104-1¶ 3 –

104-8 ¶ 3.[9]

8.      The Bout Agreements included a "Compensation"

provision which outlined the full and complete compensation

---

[9] In addition to quoting a portion of the "Promotional Rights; Rules &
Regulations", Plaintiffs also cited and quoted to the "Ancillary Rights"
provision in the Bout Agreements as part of the same proposed fact. *See*
PSMF ¶ 9. As such, the same denial was raised by the Government. *See*
GOVERNMENT'S RESPONSE SMF ¶ 9. Therefore, the Court has opted to
follow the same course of action taken at *supra* note 8 and proceeded to
cite directly to the "Ancillary Rights" for that is in fact what the provision
states and the Government agrees. The Court also notes that there are
minor variations in some of the "Ancillary Rights" provisions for each
Bout Agreement. However, said variations are not substantive in nature,
therefore, the above quoted provision conveys the central points of the
same.

for the rights granted to TR and for the services and performances required of and to be rendered by Plaintiff Cotto-Vázquez in connection with each Bout. PSMF ¶ 12; *See* Docket Nos. 102-5 ¶ 4(a) - 102-12 ¶ 4(a); 104-1 ¶ 4(a) - 104-8 ¶ 4(a). [10]

---

[10] The Government admitted that Plaintiff Cotto-Vázquez was paid for each bout. *See* GOVERNMENT'S RESPONSE SMF at ¶ 12. However, it denies the proposed fact to the extent that it constitutes an attempt to make a "legal conclusion or [that it is] suggesting an inference that the compensation was allocated within each bout agreement to rights or service . . . [because] [a]s set forth by the [Government's] motion for summary judgment . . . Plaintiff Cotto-Vázquez was paid to fight." *Id.* The Government's denial is in itself a legal argument that the Court need not entertain here. At PSMF ¶ 12, Plaintiffs cited to ¶4(a) of the Bout Agreements. The proposed fact summarizes the introductory paragraph of the "Compensation" provision at ¶4(a)—a provision which figures in all eight Bout Agreements—and states the following: "<u>Compensation</u>. (a) As full and complete compensation for the rights herein granted to TR and for the services and performances required of and to be rendered by [Plaintiff Cotto-Vázquez] herein and on condition that the Bout is completed in accordance with and subject to the provisions hereof and of the applicable standard boxing contract to be signed as provided herein, TR shall pay to [Plaintiff Cotto-Vázquez ] . . ." *See* Docket Nos. 102-5 ¶ 4(a) - 102-12 ¶ 4(a); 104-1 ¶ 4(a) - 104-8 ¶ 4(a). Bearing this in mind, at this stage, the proposed fact is admitted, for it accurately summarizes the compensation provision included in all eight of the Bout Agreements at ¶4(a).

9.    The Bout Agreement for the Abdullaev bout included the following items under the "Compensation" provision[11]:

> i.  <u>Purse</u>: The purse of Five Hundred Thousand and 00/100 ($500,000.00) Dollars, which shall be paid promptly following conclusion of the Bout in accordance with the rules of applicable State Athletic Commission. TR may deduct and withhold from the purse such sums as are necessary for payment of [Plaintiff Cotto-Vázquez's] share of the applicable athletic or boxing commission fees, sanction fees for the Bout,

---

[11] Regarding the compensation received by Plaintiff Cotto-Vázquez from TR for the Abdullaev fight, the second sentence of the Government's DSUMF ¶ 7 states that "[Plaintiff Cotto-Vázquez] purse for the fight was $500,000." Plaintiffs qualified this sentence by arguing that the "purse was a lump sum which incorporated compensation for services other than boxing and the exclusive granting of certain rights for worldwide use at perpetuity." *See* PLAINTIFFS' OPPOSING SMF ¶ 7. In further support of their qualification, Plaintiffs cited to Robert Arum's ("Mr. Arum") deposition— CEO of TR—wherein he was asked if TR and Plaintiff Cotto-Vázquez "engage[d] in negotiations regarding specific compensation attributable to the use of [Plaintiff Cotto-Vázquez 's] name, image, likeness and biographic material for the Abdullaev fight." *See* Docket No. 123-1 at pg. 41, lines 7-12. Mr. Arum responded that it was "all lumped together." *Id.* Plaintiffs' qualification is argumentative. As such, the Court will not pass upon this matter here and will quote and cite directly to the material sections of the "Compensation" provision of the Bout Agreements. This matter is further addressed in the Court's discussion regarding Count III.

for any anti-doping test, and for expenses which TR may have advanced for [Plaintiff Cotto-Vázquez ] above those items provided in paragraph 6 of this Agreement.

ii. <u>Training Expense Allowance</u>: TR shall pay to [Plaintiff Cotto-Vázquez] a non-accountable training expense allowance of $50,000. The sum of $25,000 will be paid on final execution of this Agreement and $25,000 will be paid within five (5) days of the conclusion of the Bout.

*See* PSMF ¶ 13; Docket Nos. 102-5 at pg. 5 and 104-1 at pg. 5.

10.    The Bout Agreement for the Torres bout included the following items under the "Compensation" provision[12]:

i. <u>Purse</u>: The purse of Four Hundred Thousand and 00/100 ($400,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the applicable State Athletic Commission . . .

---

[12] The Government contends that "[Plaintiff Cotto-Vázquez] was compensated by Top Rank to fight [Torres] as evidenced by the $400,000 purse." *See* DSUMF ¶ 8. Plaintiffs repeat the qualification at PLAINTIFFS' OPPOSING SMF ¶ 7, now labeled as an objection and/or opposition. *See* Plaintiffs' Opposing SMF ¶ 8. The Court maintains its stance as to Plaintiffs' objection and/or opposition, *see supra* note 11.

    ii. <u>Signing Bonus</u>: In addition, upon Fighter's execution and delivery of this Agreement, TR shall pay to [Plaintiff Cotto-Vázquez] a signing bonus of $50,000.

    iii.<u>Training Expense Allowance</u>: No later than ten (10) business days after signing and delivery of this Agreement, TR shall pay to [Plaintiff Cotto-Vázquez] a non-accountable training expense allowance of $50,000.

*See* PSMF ¶ 14; Docket Nos. 102-6 at pg. 5 and 104-2 at pg. 5.

11.     The Bout Agreement for the Malignaggi bout included the following items under the "Compensation" provision[13]:

    i. <u>Purse</u>: The purse of Seven Hundred Thousand and 00/100 ($700,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the applicable State Athletic Commission . . .

---

[13] The Government avers that "[Plaintiff Cotto-Vázquez] was compensated by Top Rank to fight [Malignaggi] as evidenced by the $700,000 purse." *See* DSUMF ¶ 9. Plaintiffs repeat the same objection and/or opposition included at Plaintiffs' Opposing SMF ¶¶ 7-8. *See* Plaintiffs' Opposing SMF ¶ 9. The Court maintains its stance as to Plaintiffs' objection and/or opposition at *supra* notes 11-12.

    ii. <u>Training Allowance</u>: Not later than ten (10 business days after signing and delivery of this Agreement, TR shall pay to [Plaintiff Cotto-Vázquez] a non-accountable training expense allowance of $100,000.

    iii.<u>Pay-Per-View Bonus</u>: In addition to [Plaintiff Cotto-Vázquez'] guaranteed purse payment, TR shall pay to [Plaintiff Cotto-Vázquez] the sum equal to Two and Fifty/100 ($2.50) Dollars for each pay-per-view home in excess of 100,000 pay-per-view homes. A "pay-per-view home," as such term is used in this Agreement, shall mean a residential cable or satellite television subscriber located in any of the 50 states of the United States and the Commonwealth of Puerto Rico who elects to view the Bout on a pay-per-view basis and who pays the required fee as collected and reported to TR by its pay-per-view licensees in such territory. This additional compensation shall be payable by TR to [Plaintiff Cotto-Vázquez ], within 30 days after TR has received its final payments and reports for pay-per-view homes in excess of 100,000 pay-per-view homes. Those reports which TR receives from its pay-per-view licensees shall be conclusive and binding upon TR and Fighter for purposes of this agreement.

*See* PSMF ¶ 15; Docket Nos. 102-7 at pgs. 5-6 and 104-3 at pgs. 5-6.

　　　12.　　The Bout Agreement for the Quintana bout included the following items under the "Compensation" provision[14]:

> i. <u>Purse</u>: The purse of One Million One Hundred Thousand and 00/100 ($1,000,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the applicable State Athletic Commission . . .

*See* PSMF ¶ 16; Docket Nos. 102-8 at pg. 6 and 104-5 at pg. 6.

　　　13.　　The Bout Agreement for the Judah bout included the following items under the "Compensation" provision[15]:

---

[14] The Government contends that "[Plaintiff Cotto-Vázquez] . . . was paid only to fight [Quintana] as indicated by the $1.1 million purse." *See* DSUMF ¶ 10. Plaintiffs reiterate the same objection and/or opposition included at PLAINTIFFS' OPPOSING SMF ¶¶ 7-9. *See* PLAINTIFFS' OPPOSING SMF ¶ 10. The Court maintains its stance as to Plaintiffs' objection and/or opposition at *supra* notes 11-13.

[15] The Government avers that "[Plaintiff Cotto-Vázquez] was compensated by Top Rank to fight [Judah] as evidenced by the $2.5 million purse." *See* DSUMF ¶ 11. Plaintiffs repeat the same objection and/or opposition included at PLAINTIFFS' OPPOSING SMF ¶¶ 7-10. *See* PLAINTIFFS' OPPOSING SMF ¶ 11. The Court maintains its stance as to Plaintiffs' objection and/or opposition at *supra* notes 11-14.

    ii. <u>Purse</u>: The purse of Two Million Five Hundred Thousand and 00/100 ($2,500,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the applicable State Athletic Commission . . .
*Parties agree that the sum of $300,000 from the total compensation corresponds to [Plaintiff Cotto-Vázquez 's] general training expenses.

*See* PSMF ¶ 17; Docket Nos. 102-9 at pgs. 5-6 and 104-6 at pgs. 5-6.

    14.    The Bout Agreement for the Mosley bout included the following items under the "Compensation" provision[16]:

    i. The purse of Two Million Seven Hundred Fifty Thousand and 00/100 ($2,750,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the applicable State Athletic Commission . . .

    iv. <u>Training Expense Allowance</u>: In addition to [Plaintiff Cotto-Vázquez'] purse, TR shall pay to

---

[16] The Government avers that "[Plaintiff Cotto-Vázquez] was compensated by Top Rank to fight [Mosley] as evidenced by the $2.75 million purse." *See* DSUMF ¶ 12. Plaintiffs repeat the same objection and/or opposition included at PLAINTIFFS' OPPOSING SMF ¶¶ 7-11. *See* PLAINTIFFS' OPPOSING SMF ¶ 12. The Court maintains its stance as to Plaintiffs' objection and/or opposition at *supra* notes 11-15.

> [Plaintiff Cotto-Vázquez] a non-accountable training expense allowance of Four Hundred Fifty Thousand and 00/100 ($450,000.00) Dollars, payable promptly following conclusion of the Bout.

*See* PSMF ¶ 18; Docket Nos. 102-10 at pgs. 5-6 and 104-7 at pgs. 5-6.

15.     The Bout Agreement for the Gómez bout included the following items under the "Compensation" provision[17]:

> i. The purse of Two Million Four [*sic*] Hundred Thousand and 00/100 ($2,200,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the Commission.

> iii. <u>Training Expense Allowance.</u> In addition to [Plaintiff Cotto-Vázquez'] purse, TR shall pay to [Plaintiff Cotto-Vázquez] a non-accountable training expense allowance of Three Hundred Thousand and 00/100 ($300,000.00) Dollars, payable promptly following conclusion of the Bout.

---

[17] The Government avers that "[Plaintiff Cotto-Vázquez] was compensated by Top Rank to fight [Gómez] as evidenced by the $2.2 million purse." *See* DSUMF ¶ 13. Plaintiffs repeat the same objection and/or opposition included at PLAINTIFFS' OPPOSING SMF ¶¶ 7-12. *See* PLAINTIFFS' OPPOSING SMF ¶ 13. The Court maintains its stance as to Plaintiffs' objection and/or opposition at *supra* notes 11-16.

*See* PSMF ¶ 19; Docket Nos. 102-11 at pg. 5 and 104-8 at pg. 5.

16.    The Bout Agreement for the Margarito bout included the following items under the "Compensation" provision[18]:

    i. The purse of Three Million and 00/100 ($3,000,000.00) Dollars, which purse shall be paid promptly following conclusion of the Bout in accordance with the rules of the Commission; and

    ii. A special television promotional services fee of One Million and 00/100 ($1,000,000.00) Dollars, which fee shall be paid promptly following conclusion of the Bout.

    iii. In addition, TR shall pay to [Plaintiff Cotto-Vázquez] the sum equal to $5.00 for each pay-per-view buy for the Bout in the United States, its territories and possessions and the Commonwealth of Puerto Rico (the "PPV Territory"), which are in excess of three hundred thousand (300,000) pay-

---

[18]    The Government avers that "[Plaintiff Cotto-Vázquez] was compensated by Top Rank to fight [Margarito] as evidenced by the $3 million purse." *See* DSUMF ¶ 14. Plaintiffs repeat the same objection and/or opposition included at PLAINTIFFS' OPPOSING SMF ¶¶ 7-13. *See* PLAINTIFFS' OPPOSING SMF ¶ 14. The Court maintains its stance as to Plaintiffs' objection and/or opposition at *supra* notes 11-17.

per-view buys up to and including three hundred fifty thousand (350,000) pay-per-view buys and the sum equal to $7.50 for each pay-per-view buy for the Bout in the PPV Territory which are in excess of three hundred fifty thousand (350,000) pay-per-view buys (the "PPV Payment").

v.   <u>Training Expense Allowance.</u> In addition to [Plaintiff Cotto-Vázquez'] purse, TR shall pay to [Plaintiff Cotto-Vázquez] a non-accountable training expense allowance of One Million and 00/100 ($1,000,000.00) Dollars, payable promptly following conclusion of the Bout.

*See* PSMF 20; Docket Nos. 102-11 at pgs. 6-7 and 104-8 at pgs. 6-7.

17.   The Bout Agreements also included the following "Publicity and Promotion" provision:

[Plaintiff Cotto-Vázquez] shall cooperate and assist in the publicizing, advertising and promoting of the Bout, and shall appear at and participate in a reasonable number of joint or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be telecast, broadcast, recorded or filmed), at times and places reasonably designated by TR.

*See* PSMF 10[19]; Docket Nos. 102-5 at ¶7(a) – 102-12 at ¶7(a) and 104-1 at ¶ 7(a) – 104-8 at ¶ 7(a).

18.     If any of the Bouts were cancelled, TR was under no obligation to pay Plaintiff Cotto-Vázquez. Docket Nos. 102-5 at ¶ 11 – 102-12 at ¶ 11 and 104-1 at ¶ 11 – 104-8 at ¶ 11.

19.     Each Bout Agreement included a "Postponement or Cancellation" provision which stated that if TR decided to terminate the Agreement "no payment shall be due to [Plaintiff Cotto-Vázquez]." *Id.*

20.     Specifically, paragraph 11(f) of the Bout Agreements explained that:

> In the event that the Bout is canceled due to a
> material breach of any covenant, representation
> or warranty of Fighter in this Agreement or for

---

[19] The Government admits that the content recited in the proposed fact reflects the language included in the Bout Agreements. *See* GOVERNMENT'S RESPONSE SMF at ¶ 10. However, the Government posits that if by referencing this paragraph "Plaintiffs are making a legal conclusion or [are] suggesting an inference that the compensation was allocated within each bout agreement to rights or services[,]" it must deny such conjectures. *Id.* The Government's denial is a legal argument which the Court will not resolve at this time. Further, the Government's denial does not point to any direct record citation to controvert the proposed fact. Accordingly, the Court has cited and quoted directly to the Bout Agreements. The proposed fact is admitted.

any other reason, except for the material breach
of a covenant, representation or warranty of TR
in this Agreement, [Plaintiff Cotto-Vázquez]
agrees promptly to return to TR any funds that
may have been advanced to [Plaintiff Cotto-
Vázquez] by TR for the Bout pursuant to this
Agreement.

*See Id.*

21.     Moreover, paragraph 12(a) of the Bout Agreements
stated that:

[d]uring the term of this Agreement, [Plaintiff
Cotto-Vázquez ] shall be ready, willing and able
to participate in the Bout to the best of [Plaintiff
Cotto-Vázquez's] ability and shall honestly
compete and given an honest exhibition of
skills. Without limiting any of TR's rights or
remedies at law or in equity, TR shall have the
right to terminate this Agreement if TR believes,
in its good faith judgment, that [Plaintiff Cotto-
Vázquez] is not ready, willing and able or
willing to participate to the best of his ability.

*See* PSUMF 11; Docket Nos. 102-5 at ¶ 12(a) – 102-12 at ¶ 12(a)
and 104-1 at ¶ 12(a) – 104-8 at ¶ 12(a).

22.     According to David López ("Mr. López"), Senior
Vice President of Finance at TR, the Bouts generated revenues

in connection with: (i) Gate Revenue; (ii) Foreign Television; (iii) Television Fees; and (iv) Advertising and Sponsorship. *See* PSMF ¶ 7; Docket No. 102-22 at pgs. 5-6 and 8, David López Certification and Declaration.[20]

23.    According to Mr. López the total approximate revenue from PPV for the Malignaggi, Judah, Mosley and Margarito Bouts, included: (i) United States Income; (ii) Canada Income; and (iii) Puerto Rico income. *See* PSMF ¶ 8; Docket No. 102-22 at pgs. 2 and 17, David López Certification and Declaration.[21]

### iii.    Plaintiffs' Tax Returns

24.    Between 2005 and 2008, Plaintiffs delegated upon Miguel Cotto-Carrasquillo ("Mr. Cotto Sr."), Plaintiff Cotto-

---

[20] The Certification and Declaration signed by David Lopez include the specific amounts as to each item. However, all "documents (including all copies, excerpts and summaries thereof) produced and deposition testimony provided, by [TR] in connection with the Subpoenas served to or to be served on Top Rank and its current and past employees, in connection with the above referenced suit[,] are subject to a Protective Order. *See* Docket No. 53. Accordingly, the Court has refrained from including the exact amounts in this Opinion and Order.

[21] *Id.*

Vázquez's father, all matters related to his businesses, finances and taxes. PLAINTIFFS' ADDITIONAL SMF ¶ 1.

25.    Certified Public Accountant ("CPA") Ramon F. Sanabria ("CPA Sanabria") was hired by Mr. Cotto Sr. to prepare Plaintiffs' federal tax returns for tax years 2005, 2006 and 2007. PLAINTIFFS' ADDITIONAL SMF ¶ 2[22].

26.    CPA Sanabria was a CPA and a tax preparer—certified by both the IRS and the Puerto Rico Treasury Department—who was in good standing while working for Plaintiff Cotto-Vázquez, Mr. Cotto Sr., and any other member

_____

[22] The proposed fact at PLAINTIFFS' ADDITIONAL SMF ¶ 2 noted that CPA Sanabria was hired by Mr. Cotto Sr. to prepare "proper federal tax returns." The Government admits that CPA Sanabria was hired by Mr. Cotto Sr. for the preparation of tax returns for tax years 2005, 2006 and 2007. Docket No. 127-1 ¶ 2. However, it denies the characterization that CPA Sanabria was hired to prepare "proper" federal tax returns on the grounds that Plaintiffs have failed to proffer any admissible evidence to support such a characterization. *Id.* Moreover, after reviewing the deposition testimony cited to by Plaintiffs at PLAINTIFFS' ADDITIONAL SMF ¶ 2, the Court finds that the characterization that CPA Sanabria was hired to prepare proper federal tax returns would require an inference on behalf of the Court. Such task falls outside of the purview of the Court at this stage. Therefore, at this time, the Court will abstain from passing on whether CPA Sanabria was hired to prepare "proper" federal tax returns and will limit its acceptance of the proposed fact as noted above.

of the Cotto family. PSMF ¶ 22; Docket No. 102-15 at pgs. 132:15-25 – 133:1-9.[23]

27.     CPA Sanabria advertised himself as an expert in the field of federal income taxes. PLAINTIFFS' ADDITIONAL SMF ¶ 7.

28.     CPA Sanabria prepared Forms 1040-PR on behalf of the Plaintiffs for tax years 2005, 2006 and 2007 and signed said federal tax returns as a paid tax preparer duly authorized by the IRS. PLAINTIFFS' ADDITIONAL SMF ¶ 6; Docket Nos. 102-1 – 102-3.

29.     On April 8, 2008, Plaintiffs' untimely filed their Form 1040-PR tax return for tax year 2006 before the IRS. DSUMF ¶ 16; Docket No. 105-6 at pg. 2.

---

[23] While the Government admits the language recited in the deposition excerpt of the proposed fact, it denies that Plaintiff Cotto-Vázquez received any advice from his CPA. *See* GOVERNMENT'S RESPONSE SMF ¶ 22. Notwithstanding the Government's denial, the fact is admitted for the same does not drive at whether CPA Sanabria advised Plaintiff Cotto-Vázquez. Rather, the proposed fact drives at CPA Sanabria's purported professional qualifications.

30.     On May 6, 2008, Plaintiffs' untimely filed their Form
1040-PR tax return for tax year 2007 before the IRS. DSUMF ¶
18; Docket No. 105-7 at pg. 2.

31.     CPA Luis Orlando Ortiz ("CPA Ortiz") was hired by
Mr. Cotto Sr. to prepare Plaintiffs' tax return for tax year 2008.
PLAINTIFFS' ADDITIONAL SMF ¶ 3.

32.     CPA Ortiz prepared Form 1040-PR on behalf of the
Plaintiffs and signed said federal tax return for tax year 2008,
as a paid tax preparer, duly authorized by the IRS. PLAINTIFFS'
ADDITIONAL SMF ¶ 6; Docket No. 102-4.

33.     On May 18, 2009, Plaintiffs filed their Form 1040-PR
tax return for tax year 2008. Docket Nos. 102-4 and 105-8 at
pg. 2.

34.     At the time that the 1040-PR tax returns were filed
for the Tax Years, Plaintiffs did not file 1040-US tax returns,
for CPA's Sanabria and Ortiz only prepared Forms 1040-PR.

PLAINTIFFS' ADDITIONAL SMF ¶ 8[24]; PSMF 24.[25]

35.     The entire Agreement Income was therefore exclusively reported in Forms 1040-PR for tax years. PSMF ¶¶ 24[26], 26; Docket No. 102-1 – 102-4.

---

[24] PLAINTIFFS ADDITIONAL SMF ¶ 8 stated as follows "[t]he Plaintiffs signed and filed the Forms 1040-PR for tax years 2005, 2006, 2007 and 2008 as prepared by CPA Sanabria and CPA Ortiz and did not file Forms 1040-US relying on their CPAs tax knowledge and professional judgment." The Government admitted that Plaintiffs signed and filed Forms 1040-PR for the Tax Years, as prepared by CPA Sanabria and CPA Ortiz. GOVERNMENT'S REPLY TO PLAINTIFFS' ADDITIONAL SMF ¶ 8. The Government also admitted that Plaintiffs did not file Forms 1040-US. *Id.* Nevertheless, the Government denied that Plaintiffs received any advice from their accountants. *Id.* Whether Plaintiffs received—or did not receive—any advice from their accountants is not addressed by the Court at this time in view of our discussion, *infra*, regarding Count I.

[25] As discussed at *infra* note 26, the Government denied PSMF ¶ 24 on the grounds that Plaintiffs did not receive any advice from their accountants. DSUMF ¶ 24. However, here, PSMF ¶ 24 is admitted for the sole purpose of explaining that CPA Sanabria and CPA Ortiz did not file any 1040-US forms. The Government did not deny or object such proposition.

[26] The proposed fact at PSMF ¶ 24 is a compounded one for it includes a statement and an extract of CPA Sanabria's deposition. The latter was denied by the Government on the grounds that Plaintiff Cotto-Vázquez did not receive any advice from CPA Sanabria. DSUMF ¶ 24. Here, the Court admits the portion of the proposed fact including the statement which reflects that both CPA Sanabria and CPA Ortiz reported the entire Agreement Income in Forms 1040-PR for the Tax Years, for whether advice was provided—or not provided—will not be addressed at this time

### iv.   IRS-PR Tax Audit

36.     On or around the year 2009, the IRS commenced an income tax audit regarding the income earned by Plaintiffs from the Bout Agreements ("IRS-PR Audit") as reported in their 1040-PR returns for the Tax Years. PSMF ¶ 28.

37.     Agent Javier Cortés ("Agent Cortés") was the IRS Revenue Agent assigned to carry out the examination. PSMF ¶ 21.

38.     During the audit process, Plaintiffs requested the "non-assertion" of penalties on the grounds that they had followed the advice provided to them by CPA Sanabria. Docket No. 102-16.[27]

---

in view of the Court's discussion and determination regarding Count I. *See also supra* note 25.

[27] Plaintiffs' proposed fact at PSMF ¶ 32 states that Plaintiffs requested the "non-assertion" of penalties because they followed the advice provided to them by both CPA Sanabria and CPA Ortiz. Plaintiffs cited to Docket No. 102-16 (Exhibit P), which is a letter that was signed by Plaintiff Cotto-Vázquez in support of this proposed fact. Upon reviewing said letter, the Court points out that the same solely states that Plaintiffs relied on the advice allegedly furnished to them by CPA Sanabria. There is no mention of CPA Ortiz in the letter. For this reason, the fact, as admitted by this Court, reflects the content of the letter cited by Plaintiffs. Moreover, the Court acknowledges that the Government denied a portion of the

39.    On or around November 24, 2009, the IRS-PR issued a Penalty Approval Form which reflected that only a failure to file penalty for tax year 2006 had been assessed. Docket No. 102-17. [28]

40.    In the Penalty Approval Form, Agent Cortés

proposed fact—since this was yet another compounded fact—however, that is not the portion that has been admitted by the Court here and, even then, the Government's denial was not accompanied by a direct record citation as required by Local Rule 56(e). The portion of the proposed fact which was denied by the Government is discussed at *infra* note 29.

[28] The starting point of this fact is PSMF ¶ 34, which is yet another compounded fact for Plaintiffs proposed fact contains a statement and a recitation of Agent Cortés's deposition testimony. In this case, the Court has admitted the statement reflecting the content of the Penalty Approval Form, for the Government did not oppose the same. The Government denied PSMF ¶ 34 to the extent that it was an attempt to suggest an inference based on Agent Cortés's deposition testimony. In its denial the Government did not cite to any record citation. The Court acknowledges that the portion of Agent Cortés's deposition testimony, as cited, does not provide sufficient context to determine what exactly was being discussed. Moreover, the proposed fact mentions the "abatement" of the penalties, however, the Penalty Approval Form solely refers to the assertion of penalties. At this juncture and in view of the records available to the Court it does not appear that the abatement of penalties was being discussed but rather the "non-assertion" of penalties. In view of these discrepancies and the uncertainty surrounding Agent Cortés's testimony, the Court has cited directly to the Penalty Approval Form.

reasoned that Plaintiffs had relied on their CPAs for the preparation of their tax returns. PSMF ¶ 32[29]; PLAINTIFFS' ADDITIONAL SMF ¶ 9;[30] Docket No. 102-17.

---

[29] The proposed fact at PSMF ¶ 32 is yet another compounded proposed fact, whereby Plaintiffs include a statement along with extracts from certain deposition testimony. The deposition testimony quoted at PSMF ¶ 32 is that of Agent Cortés whereby he explains his understanding that Plaintiff Cotto-Vázquez was entitled to the non-assertion of penalties because there was no willful neglect on his behalf or his tax preparers and he relied on the advice of both CPA Sanabria and CPA Ortiz. The Government denies the proposed fact to the extent that "Plaintiffs are making a legal conclusion or suggesting an inference that the revenue agent's thoughts and conclusions carry evidentiary weight[.]" GOVERNMENT'S RESPONSE SMF ¶ 32. The Court acknowledges that this is a *de novo* proceeding, however, here, the Court declines the Government's invitation to set aside the **fact** that Agent Cortés understood that it was not necessary to impose failure to pay penalties for tax year 2006 through 2008 because Plaintiffs reportedly relied on their CPAs. This does not mean, however, that the Court is making a determination as to whether Plaintiffs were in fact—or were not—advised by their CPAs.

[30] The Government objects to PLAINTIFFS' ADDITIONAL SMF ¶ 9 on the grounds that this is a *de novo* proceeding, as such, the reasoning employed by Agent Cortés is immaterial. GOVERNMENT'S REPLY TO PLAINTIFFS' ADDITIONAL SMF ¶ 9. And because Agent Cortés's statements do not bind the Government. *Id.* Here, the Court maintains the same reasoning as *supra* note 29. The Court also declines to entertain the Government's denial as to the lack of evidentiary weight of Agent Cortés's statements at this juncture. Lastly, the Government's reassertion that Plaintiffs did not have reasonable cause for failing to timely file and pay their taxes is argumentative and will not be addressed here.

41.    In the Penalty Approval Form, Agent Cortés also noted that "[Plaintiff Cotto-Vázquez] showed no knowledge of tax law as his education is limited to high school. Puerto Rico source income is exempted of federal income taxes per IRC 933 and is very common that residents of Puerto Rico have no knowledge of their US tax obligations." PSMF ¶ 35[31]; Docket No. 102-17 at pg. 1.

42.    The Penalty Approval Form was approved by the IRS-PR group manager, Mrs. Lilian Dones. PLAINTIFFS' ADDITIONAL SMF ¶ 10;[32] Docket No. 102-17.

43.    As part of the audit, Agent Cortés ascertained that in preparation for the Bouts, Plaintiff Cotto-Vázquez   (i)

---

[31] The Government objects to PSMF ¶ 35 on the same grounds as *supra* notes 29-30. As stated at *supra* notes 29-30, the Court acknowledges that this is a *de novo* proceeding, however, here, the Court declines the Government's invitation to set aside the **fact** that Agent Cortés made such observations in the Penalty Approval Form.

[32] The Government's objection and denial of PLAINTIFFS' ADDITIONAL SMF ¶ 10 mirror those discussed at *supra* notes 29-31. As stated at *supra* notes 29-31, the Court is aware that this is a *de novo* proceeding, however, here, the Court declines the Government's invitation to set aside the **fact** that Mrs. Lilian Dones approved the Penalty Approval Form.

trained a significant amount of time in Puerto Rico, (ii) participated in promotional activities and press conferences held in Puerto Rico as a preamble of each of the fights and (iii) Plaintiff Cotto-Vázquez 's name, image and likeness was used in Puerto Rico for television advertisements, printed press, billboards and other types of advertising. PSMF ¶ 29.[33]

44.    The IRS-PR's audit determined that all of the Agreement Income, was to be considered United States source income. PSMF ¶ 30; DSUMF ¶ 5.

45.    At the conclusion of the audit, the IRS prepared Form 4549—Income Tax Examination Changes ("Forms

---

[33] The admitted fact summarizes Agent Cortés's deposition testimony in connection with the instant suit. *See* Docket No. 102-13 at pgs. 100:2-14 and 101:3-14. The Government denied the proposed fact to the extent Plaintiffs were attempting to reach a legal conclusion or infer that Plaintiff Cotto-Vázquez was compensated for something else other than fighting. GOVERNMENT'S RESPONSE SMF ¶ 29. Further, the Government sustained that the revenue agent's statements were non-binding. *Id.* The Court finds that the Government's denial constitutes a legal argument that may be disregarded for the purposes of determining the uncontested facts in this suit. As to the matter concerning the nature of Agent Cortés's deposition testimony, the Court is aware that this is a *de novo* proceeding, but that does not preclude the Court from admitting the **fact** that Agent Cortés made such statements.

4549") and Form 870 for tax years 2006, 2007 and 2008. DSUMF ¶ 6[34]; PSMF ¶ 31; Docket No. 105-9.

46.     Forms 4549 were executed by Plaintiffs. DSUMF ¶ 6[35]; Docket No. 105-9.

47.     The amounts included in Forms 4549 reflected the IRS-PR's determination regarding Plaintiffs' tax deficiencies regarding the income earned by Plaintiff Cotto-Vázquez in connection with the Bout Agreements. DSUMF ¶ 6[36]; Docket

[34] Plaintiffs did not deny that at the conclusion of the audit Forms 4549 were prepared.

[35] Plaintiffs did not deny that they signed Forms 4549.

[36] Plaintiffs denied the Government's characterization that "the amounts included in Form 4549 reflected the Plaintiffs' tax deficiencies on the amounts Plaintiff Cotto-Vázquez earned for the bouts fought outside of Puerto Rico." PLAINTIFFS' OPPOSING SMF ¶ 6. Plaintiffs contend that the assessment included in Forms 4549 is improper because a significant portion "arises from the taxation of compensation for services rendered by Plaintiff Cotto Vázquez in Puerto Rico and the exclusive granting of personal intangible rights." Id. The Court finds that Plaintiffs' denial constitutes a legal argument. The fact remains that Forms 4549 reflect the IRS-PR's audit determination that the income earned in connection with the Bout Agreements was to be considered United States source income. Plaintiffs admitted this. See DSUMF ¶ 5; PLAINTIFFS' OPPOSING SMF ¶ 5. As such, the proposed fact at DSUMF ¶ 6 is deemed admitted in order to reflect the IRS-PR's audit determination.

No. 105-9.

48.     In view of the IRS-PR's audit results, on February 8, 2010, Plaintiffs were assessed and notified a total of $5, 330,386.00 in tax deficiencies ("IRS-PR Assessment") in the following principal amounts:

(a) $383, 430.00 for tax year 2005;

(b) $646,529.00 for tax year 2006;

(c) $1,748,472.00[37] for tax year 2007; and

(d) $2,542,955.00[38] for tax year 2008.

---

[37] In their PSMF ¶ 31, Plaintiffs listed the notified tax deficiency as $1,751,472.00. The Government admitted this fact. *See* GOVERNMENT'S RESPONSE SMF ¶ 31. However, at DSMF ¶ 3, the Government specified the amount as totaling $1,748,472.00. In support of this amount, the Government cited to a Certificate of Official Record prepared by the IRS. *See* Docket No. 105-7. Plaintiffs accepted the proposed fact as to the amount in question albeit having included a qualification as to whether the imposition of the assessment was correct. PLAINTIFFS' OPPOSING SMF ¶ 3. Here, the Court will refer to the amount listed in the IRS's Certificate of Official Record for the authenticity of said document has not been disputed by the Parties.

[38] Likewise, in their PSMF ¶ 31, Plaintiffs listed the notified tax deficiency as $2,545,955.00. The Government admitted this fact. *See* GOVERNMENT'S RESPONSE SMF ¶ 31. But at DSMF ¶ 4, the Government specified the amount as totaling $2,542,955.00. In support of this amount, the Government cited to a Certificate of Official Record prepared by the IRS. *See* Docket No. 105-8. Plaintiffs accepted the proposed fact as to the

*See* PSMF ¶ 31; DSUMF ¶¶ 1-4[39]; Docket Nos. 105-5 at pg. 3; 105-6 at pg. 3; 105-7 at pg. 3; and 105-8 at pg. 2.

## v.   Request for Audit Reconsideration

49.     On or around March 26, 2010, Plaintiffs requested an Audit Reconsideration regarding the IRS-PR's Assessment, therefore prompting the IRS-PR Office to reopen the matter. PSMF ¶ 36; Docket No. 29-9.

---

amount in question albeit having included a qualification as to whether the imposition of the assessment was correct. PLAINTIFFS' OPPOSING SMF ¶ 4. Here, the Court will refer to the amount listed in the IRS's Certificate of Official Record for the authenticity of said document has not been disputed by the Parties.

[39] DSUMF's ¶¶ 1-4 categorize the assessment of income taxes as having been done in a "proper and timely" fashion. Plaintiffs deny this because "[t]he assessment is improper inasmuch a significant portion of the same arises from the taxation of compensation for services rendered by [Plaintiff Cotto-Vázquez] in Puerto Rico and the exclusive granting of personal intangible property, both of which are deemed to be [Puerto Rico] source income, which is exempt from federal income taxes under United States Internal Revenue Code Section 933." PLAINTIFFS' OPPOSING SMF ¶¶ 1-4. Plaintiffs' denial is a legal argument which will not be considered by the Court. The amounts admitted were in fact the amounts assessed. However, because here the Court will not pass on the matter concerning whether the assessment was "properly" done, the Court has also cited directly to the IRS's Certificates of Official Record.

50.    On   March   22,   2011,   the   IRS-PR   issued   a
determination on the Audit Reconsideration upholding the
IRS-PR Assessment ("Audit Final Determination"). PSMF ¶
37; Docket No. 102-18.

51.    The   Audit   Final   Determination   referred   to   an
income sourcing allocation method known as "event-based
method" and concluded that Plaintiff Cotto-Vázquez was
compensated "purely for boxing an event." PSMF ¶¶ 38-39[40];
Docket No. 102-18.

52.    According to Agent Cortés, it was recommended
that he use the "event-based method", which is an IRS
Proposed   Regulation,   to   render   the   Audit   Final
Determination. PSMF ¶ 40.[41]

---

[40] The Government admits that the IRS determined that Plaintiff Cotto-
Vázquez was compensated only for fighting. *See* GOVERNMENT'S RESPONSE
SMF ¶¶ 38-39. Nevertheless, it argues that because this is a *de novo*
proceeding, the IRS's reasoning is irrelevant and immaterial. *Id.* The Court
recognizes that this is a *de novo* proceeding, however, here, the Court
declines the Government's invitation to set aside the fact that an "event-
based method" was used in the IRS-PR Final Determination and the Audit
Final Determination cited by Plaintiffs in support of PSMF ¶¶ 38-39
reflects as much. *See* Docket No. 102-18.

[41] The Government admits that in his deposition testimony, Agent Cortés

**vi.   The First Appeal and the IRS-Las Vegas Notice of Intent to Levy**

53.    In 2011, Plaintiffs appealed the contested portions of the IRS-PR Assessment ("First Appeal"). PSMF ¶ 43; Docket No. 29-10.

54.    On or around January 25, 2012, Plaintiffs paid to the IRS the portions of the IRS-PR Assessment which they deemed uncontested. PSMF ¶ 41; Docket No. 102-19 at pgs. 5, 10, 16 and 22.

55.    The payment included both the corresponding principal amounts and an estimate of the accrued interest as of the payment date for a total aggregate amount of $1,072,611.00, credited as follows:

(a) $69,169.00 for tax year 2005;

(b) $130,499.00 for tax year 2006;

---

stated it was recommended that he use the event-based method in order to render the Final Determination. GOVERNMENT'S RESPONSE SMF ¶ 40. However, it reiterates that this is a *de novo* proceeding and therefore, Agent Cortés's reasoning is immaterial. *Id.* While the Court is aware of the nature of this proceeding, the fact that Agent Cortés was recommended the event-based method will be admitted.

(c) $383,721.00 for tax year 2007; and

(d) $489,222.00 for tax year 2008.

*See* PSMF ¶ 42; Docket Nos. 2-2 and 102-19 at pgs. 5, 10, 16 and 22.

56.     On April 16, 2012, while Plaintiffs' First Appeal remained pending, the IRS's regional office in Las Vegas ("IRS-LV"), sent Plaintiffs a Notice of Intent to Levy in the aggregate amount of $6,751,909.95, distributed as follows:

(a) $603,612.09 for tax year 2005;

(b) $1,064,956.96 for tax year 2006;

(c) $2,105,782.46 for tax year 2007; and

(d) $2,977,549.44 for tax year 2008.

PSMF ¶ 44.

57.     Initially, the IRS-LV granted Plaintiffs until April 26, 2012 to satisfy the required amounts prior to proceeding with the levy. *Id.*

58.     On April 26, 2012, the IRS-Appeals Office issued a determination letter regarding Plaintiffs' First Appeal whereby it notified that a $155,509.09 downward adjustment for tax year 2005 would be made to the IRS-PR's Assessment

in view of "mathematical and other errors." PSMF ¶ 45[42]; Docket No. 2-3 at pg. 3.

59.     The IRS-Appeals Office made no adjustments to the IRS-PR's Assessment in connection with the penalties for taxable years 2006, 2007 and 2008, therefore fully sustaining the rest of the IRS-PR's Assessment. PSMF ¶ 46; Docket No. 2-3.

60.     That same day, the IRS-LV updated the Notice of Intent to Levy ("Updated Notice of Intent to Levy") to extend Plaintiffs' payment deadline until April 30, 2012 and increased the amount of accrued interest proportionally for a new total amount owed of $6,753,726.27 distributed as follows:

   a.  $603,810.02 for tax year 2005;

   b.  $1,065,263.24 for tax year 2006;

   c.  $2,106,332.69 for tax year 2007; and

   d.  $2,978,320.33 for tax year 2008.

[42] The proposed fact at PSMF ¶ 46 did not expand upon the nature of the errors, however, for the sake of clarity, the Court directly quoted the IRS-Appeals Office determination letter which specified that the errors were "mathematical" in nature. *See* Docket No. 2-3.

*See* PSMF ¶ 47; Docket No. 102-20.

61.    Furthermore, the Updated Notice of Intent to Levy included the following additional late payment penalties and accrued interest:

(a) Late Payment Penalties: (i) $158,369.77 for tax year 2006; (ii) $427,790.19 for tax year 2007; and (iii) $626,626.80 for tax year 2008; and

(b) Accrued Interest: (i) $79,492.96 for tax year 2006; (ii) $157,183.90 for tax year 2007; and (iii) $216,792.17 for tax year 2008.

*See* PSMF ¶¶ 48-49; Docket No. 102-20.

62.    On April 27, 2012, Plaintiff Cotto-Vázquez paid the IRS $6,598,217.18, after having deducted $155,509.09 from the required amount on the Notice of Levy of $6,753,726.27, in view of the downward adjustment made by the IRS-Appeals Office for tax year 2005. PSMF ¶ 50[43]; Docket No. 2-4.

---

[43] PSMF ¶ 50 states that Plaintiff Cotto-Vázquez proceeded with the full payment of the amount required in the Updated Notice of Intent to Levy, "[i]n order to avoid any seizure." While the Government admitted that Plaintiff Cotto-Vázquez  fully paid the amount required in the Updated Notice of Intent to Levy, it stated that it could "neither admit or deny his

63.    Plaintiff Cotto-Vázquez's payment included the
penalties and accrued interest, itemized as follows:

(a) Late Filing Penalty[44]: (i) $168,965.64 for tax year 2006;
and (ii) $994.75[45] for tax year 2007;

---

intentions, nor are his intentions for making the payment material to this case." GOVERNMENT'S RESPONSE SMF ¶ 50. While the fact is deemed admitted, the Court has not included the phrase "[i]n order to avoid any seizure" for it drives at Plaintiff Cotto-Vázquez's motives.

[44] In their Opposition to the Government's Motion for Summary Judgment, Plaintiffs waived their request for refund regarding the penalties assessed for the late filing of Form 1040-PR for tax years 2006 and 2007. *See* Docket No. 122 at pg. 15. These penalties stem from the untimely filing of Plaintiffs' 2006 and 2007 Form 1040-PR. DSUMF ¶¶ 16-19. Specifically, Form 1040-PR for tax year 2006 was filed on April 8, 2008. DSUMF ¶¶ 16-17. In view of this late filing, Plaintiffs were subsequently assessed two late filing penalties. *Id*. The first late filing penalty was assessed on May 12, 2008, in the amount of $3,190.00 and the second was assessed on February 8, 2010 in the amount of $165,776.00. *Id*. On the other hand, Form 1040-PR for tax year 2007 was filed on May 6, 2008. DSUMF ¶ 18. On June 9, 2008, Plaintiffs were assessed a late filing penalty in the amount of $995.00. DSUMF ¶ 19.

[45] The Court is unable to read the total amount of the late payment penalty assessed for tax year 2007 at Docket Number 102-19. Only the following is legible "$994." However, given the Government's acceptance of PSMF ¶ 52 stating that the total amount for this particular penalty was $994.75, *see* GOVERNMENT'S RESPONSE SMF ¶ 52, coupled with the fact that Plaintiffs waived their request for refund as to this amount, here, the Court will use the amount proffered by Plaintiffs.

(b) Failure to Pay Estimated Taxes Penalty[46]: (i) $642.37 for tax year 2006; (ii) $686.43 for tax year 2007; and (iii) $624.79 for tax year 2008;

(c) Late Payment Penalty: (i) $159,379.21 for tax year 2006; (ii) $427,921.53 for tax year 2007; and (iii) $626,821.23 for tax year 2008; and

(d) Interest Accrued for Late Payment: (i) $223,100.37 for tax year 2006; (ii) $310,739.31[47] for tax year 2007; and

---

[46] Plaintiffs also waived their request for refund concerning the penalty assessed for their failure to pay estimated taxes for tax years 2006, 2007 and 2008. *See* Docket No. 122 at pg. 15. Nevertheless, Plaintiffs admitted the Government's proposed facts at DSUMF ¶¶ 28-30. *See* PLAINTIFFS' OPPOSING SMF ¶¶ 28-30.

[47] The proposed fact at PSMF ¶ 52 reflects the amount of $157,271.12 in interest accrued for late payments for tax year 2007. The Government admitted this proposed fact. GOVERNMENT'S RESPONSE SMF ¶ 52. However, in their Opposition to the Government's Motion for Summary Judgment, Plaintiffs state that they seek a refund for interest accrued for late payment in the total amount of $310,739.31. *See* Docket No. 122 at pg. 15. In view of this discrepancy, the Court reviewed the materials cited in the proposed fact, namely, Plaintiffs Account Transcripts. *See* Docket No. 102-19. After reviewing the same, the Court identified the following four instances in which Plaintiffs were charged interest in connection with the late payment of their taxes for tax year 2007: (i) $77.99; (ii) $16.23; (iii) $153,468.19; and (iv) $157,176.90 for a total of $310,739.31. Therefore, the Court admits the proposed fact, but notes that the total interest accrued in relation to late payment penalties for tax year 2007 is $310,739.31.

(iii) $294,141.31 for tax year 2008.

*See* PSMF ¶¶ 51-53.

**vii.  Claim for Refund and Request for Abatement**

64.    On January 21, 2014, Plaintiffs filed before the IRS-
PR an Amended US Individual Income Tax Return Form
1040X for each of the Tax Years. PSMF ¶ 54; Docket No. 29-3.

65.    On that same day, Plaintiffs also filed Forms 843
before the IRS-PR in order to complete their Claim for Refund
and Request for Abatement ("Claim for Refund"). PSMF ¶¶
55-56; Docket Nos. 29-2 and 102-21.

66.    On October 23, 2014, the IRS-Appeals Office rejected
the Claim for Refund on the grounds that the income earned
from the Bout Agreements was in its entirety United States
source income and that no cause existed for the penalties to
be abated ("IRS-Appeal's Claim for Refund Determination").
PSMF ¶ 57; Docket No. 2-5.

67.    The IRS-Appeal's Claim for Refund Determination
also informed Plaintiffs of their right to bring suit or
proceedings for the recovery of any overpayment of tax,
penalties or other moneys by filing a suit before the

corresponding United States District Court within two years from the mailing date of its final determination. PSMF ¶ 58; Docket No. 2-5.

68.    The two-year term would expire on October 22, 2016. *Id.*

69.    On October 7, 2016 Plaintiffs filed the Original Complaint requesting a refund of overpaid taxes, penalties and interests. PSMF ¶ 59; Docket No. 2.

**C. Analysis**

*i.    Count 1: Request for Refund of Penalties*

Both Plaintiffs and the Government moved for summary judgment as to Count I. At the outset, there are several matters that need to be addressed by the Court. For starters, in their Amended Complaint and Partial Motion for Summary Judgment, Plaintiffs explained that, they sought a refund for, *inter alia,* the imposition of penalties pursuant to 26 U.S.C.A. § 6651(a)(1) due to their failure to timely file their income tax returns. *See* Docket Nos. 26 at ¶¶ 59-73 and 101 at pgs. 3-10. However, in their Opposition to the Government's Motion for Summary Judgment, Plaintiffs waived their

request for refund under § 6651(a)(1). *See* Docket No. 122 at pg. 15. In accordance with Plaintiffs' waiver, here, the Court will solely focus on Plaintiffs' request for refund regarding the failure to pay penalties imposed as to tax years 2006, 2007 and 2008. This brings us to the next matter that must be addressed; the failure to pay penalty that will guide the Court's analysis as to Count I.

Section 6651 of the Internal Revenue Code ("IRC") encapsulates two failure to pay penalties, to wit, those under § 6651(a)(2) and those under 26 U.S.C.A. § 6651(a)(3). The aforementioned provisions state the following:

> (a) Addition to tax. —In case of failure—
>
> (2) to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount shown as tax on such return 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction

thereof during which such failure continues, not exceeding 25 percent in the aggregate; or

(3) to pay any amount in respect of any tax required to be shown on a return specified in paragraph (1) which is not shown (including an assessment made pursuant to section 6213(b)) within 21 calendar days from the date of notice and demand therefor (10 business days if the amount for which such notice and demand is made equals or exceeds $100,000), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount of tax stated in such notice and demand 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

*See* 26 U.S.C.A. §§ 6651(a)(2)-(3).

As gleaned from both provisions, in order for such penalties to be refunded, the taxpayer bears the burden of establishing that his or her failure to pay was due to "reasonable cause" and not "willful neglect". In *United States*

*v. Boyle,* 469 U.S. 241, 245 (1985), the Supreme Court defined "willful neglect" as "conscious, intentional failure or reckless indifference." While the IRC does not define "reasonable cause", Treasury regulations lend a helping hand by explaining that "reasonable cause" in connection with a failure to timely pay penalty exists if the taxpayer can show that he or she "exercised ordinary business care and prudence in providing for payment of his [or her] tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he [or she] paid on the due date." *See* 26 C.F.R. § 301.6651-1(c)(1).[48]

As explained, *supra,* both penalties require a showing of "reasonable cause" and an absence of "willful neglect" in order for the refund of the same to follow. The key distinction

---

[48] To date, the First Circuit has yet to deep dive into an exploration regarding the contours and delimitations of the term "reasonable cause" as it pertains to penalties under §§ 6651(a)(2)-(3). For example, in *Shafmaster v. United States,* 707 F.3d 130, 137 (1st Cir. 2013), a case which focused on a penalty imposed pursuant to § 6651(a)(3), the First Circuit focused its analysis in applying Treasury Regulation § 301.6651-1(c)(1)— in addition to § 301.6651-1(b), which defines "undue hardship"—to the facts at hand.

between the two penalties therefore lies in that the penalty pursuant to § 6651(a)(2) "applies only to unpaid tax shown on the return and thus does not reach taxpayers who fail to pay assessed deficiencies or who fail to file any return." *See* Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, ¶ 117.2, at *3 (Westlaw 2020). In turn, it is § 6651(a)(3) which imposes a penalty "for failure to pay tax that is required to be shown on a return, but is not [.]" *Id*. Simply put, the penalty under § 6651(a)(2) is imposed when a taxpayer reports on his or her tax return a specific amount of tax owed but fails to pay the total amount or only pays a portion of the tax owed by the prescribed due date. In such cases, the IRC mandates the imposition of a penalty pursuant to § 6651(a)(2). Meanwhile, if a taxpayer filed a return but other amounts such as deficiencies are subsequently assessed and he or she fails to pay the same by the prescribed due date, the IRC calls for the imposition of a penalty under § 6651(a)(3). *See* 14A Mertens Law of Federal Income Taxation § 55:10 (Westlaw 2020) (explaining that a penalty pursuant to § 6651(a)(3) "applies to amounts subsequently assessed while

the failure to pay penalty under [§] 6651(a)(2) applies to unpaid amounts showing due on the return as originally filed.").

Another aspect that further differentiates the two penalties is that they are asserted at different junctures. As the plain text of the provisions reveal, the penalty under § 6651(a)(2) is imposed and begins to accrue from the original due date of the return. Conversely, the penalty under § 6651(a)(3), is imposed and begins to accrue, either 21 days from the date of notice and demand for the newly assessed amount, if the amount shown on the notice and demand is under $100,000.00, or within 10 days from the date of notice and demand if the assessed amount equals or exceeds $100,000.00.

The moment the penalty is imposed is a crucial component of the Court's inquiry regarding a potential refund. The reason being that, in order for a taxpayer to effectively invoke the existence of "reasonable cause", the same must have existed on the date prescribed for payment. *See Estate of Hartsell v. C.I.R.,* T.C.M. (RIA) 2004-211, 2004 WL

2094750 at *3 (2004).  Indeed, events that take place after the date prescribed for payment may still be taken into account when determining the existence of such "reasonable cause" that would justify a refund of a failure to pay penalty, but the central point of inquiry remains on the date prescribed for payment. *Id.*; *see also Estate of Sowell v. United States,* 198 F.3d 169, 173 n. 4 (5th Cir. 1999).

Here, Plaintiffs framed their request for refund as to the failure to pay penalty under § 6651 (a)(2). Likewise, the Government structured its own motion for summary judgment as well as its Opposition to Plaintiffs' Partial Motion for Summary Judgment with § 6651(a)(2) in mind. Neither Plaintiffs nor the Government touched on § 6651(a)(3). Furthermore, the IRS transcripts and Certificates of Official Record proffered by Plaintiffs and the Government do not specify under which of the failure to pay provisions the penalties were imposed. Despite this omission, it was precisely due to an examination of the IRS transcripts and Certificates of Official Record—documents whose authenticity have not been disputed by the Parties—that the

Court was able to identify what appears to be the Parties' misplaced reliance on § 6651(a)(2) instead of § 6651(a)(3) throughout their respective motions. Let us explain.

It is undisputed that on or around the year 2009, Plaintiffs' tax returns for the Tax Years were selected for audit by the IRS. UF ¶ 36. At this point, Plaintiffs had reported the entire income earned in connection with the Bout Agreements exclusively in their Form 1040PR for the Tax Years. UF ¶ 35. It is also undisputed that Forms 1040PR for tax years 2006, 2007 and 2008 were untimely filed. UF ¶¶ 29-30, 33. The IRS transcripts and Certificates of Official Record disclose the following failure to pay penalties:

| Tax Year – 2006[49] | |
| --- | --- |
| *Assessment Date* | *Amount* |
| May 12, 2008 | $678.70 |
| February 8, 2010 | $330.74 |

---

[49] *See* Docket Nos. 102-19 at pgs. 9-10 and 105-6 at pgs. 2-6.

COTTO-VÁZQUEZ ET. AL., V. U.S.A.            Page 57

| | |
|---|---|
| May 21, 2012 | $158,369.77 |
| **TOTAL** | $159,379.21 |

| Tax Year – 2007[50] | |
|---|---|
| *Assessment Date* | *Amount* |
| February 8, 2010 | $140.21 |
| May 21, 2012 | $427,781.32 |
| **TOTAL** | $427,921.53 |

| Tax Year – 2008[51] | |
|---|---|
| *Assessment Date* | *Amount* |
| June 29, 2009 | $44.42 |
| February 8, 2010 | $150.00 |
| May 21, 2012 | $626,626.81 |
| **TOTAL** | $626,821.23 |

---

[50] *See* Docket Nos. 102-19 at pg. 16 and 105-7 at pgs. 2-6.

[51] *See* Docket Nos. 102-19 at pgs. 21-22 and 105-8 at pgs. 2-6.

As previously indicated, the IRS did not pick up Plaintiffs' returns for audit until sometime in 2009 and the deficiencies were not assessed until the IRS-PR Assessment on February 8, 2010. UF ¶¶ 36, 48. Further, Plaintiffs only paid a portion of their tax liability on January 25, 2012 while the remainder was paid on April 27, 2012. *See* UF ¶¶ 54-55, 62-63. Ultimately, Plaintiffs' filed their Amended US Individual Income Tax Return Form 1040X for the Tax Years on January 21, 2014. *See* UF ¶ 64. In view of these undisputed facts, the Court reasons that any failure to pay penalty prior to the IRS-PR Assessment must pertain to Plaintiffs' failure to pay the amount owed in connection with the 1040PR Forms as reported when filed on April 8, 2008 (Form 1040PR for tax year 2006), May 6, 2008 (Form 1040PR for tax year 2007 and May 18, 2009 (Form 1040PR for tax year 2008), respectively.[52] And because the

---

[52] The Government's proposed facts at DSUMF ¶¶ 22-24 state that Plaintiffs were assessed the following failure to pay penalties: $159,380 (for tax year 2006); $427, 921 (for tax year 2007); and $626,821 (for tax year 2008). *See also* Docket No. 105-1 at pgs. 16-17. Additionally, the Government's proposed fact at DSUMF ¶ 25 states that the aforementioned failure to pay penalties were in connection with Plaintiffs' failure to pay their United States Federal Income Taxes. *Id.* Plaintiffs

failure to pay penalty prior to the IRS-PR Assessment was in connection with an amount shown on the Forms 1040PR and still owed, the same must have been imposed pursuant to § 6651(a)(2).  In this vein, the Court points out that, Plaintiffs' request for refund—as articulated in their Amended Complaint and briefings in connection with the motions for summary judgment pending before this Court—is devoid of any purported "reasonable cause" regarding the failure to pay penalties imposed prior to the IRS-PR Assessment and in connection with Forms 1040PR for tax years 2006, 2007 and 2008.

---

admitted DSUMFs ¶¶ 22-25. *See* PLAINTIFFS' OPPOSING SMF ¶¶ 22-25. However, the facts—as relayed in the Court's UFs—denote that it was not until the IRS-PR picked up Plaintiffs' tax returns for the Tax Years for audit, on or around 2009, *see* UF ¶ 36, that it was determined that all of the Agreement Income was to be considered United States source income. *See* UF ¶ 44. Therefore, this is why the Court reasons that any failure to pay penalties prior to the IRS-PR's Audit—which appear to be the $678.70 for tax year 2006 and the $44.42 for tax year 2008—must pertain to failure to pay penalties in connection with the 1040PR Forms which were the only tax returns that had been filed up to that point, and—per the facts currently before this Court—there had yet to be a determination regarding Plaintiffs' tax liability pertaining to the Agreement Income being deemed as entirely United States source income.

Furthermore, the IRS Transcripts disclose that, on February 8, 2010, a "Notice" was issued to Plaintiffs. Docket No. 102-19 at pgs. 10, 16, 22. However, without a copy of said "Notice", the Court is unable to discern the nature of the same, *e.g.*, if it was in fact a notice and demand for payment of the newly assessed tax liability in view of the IRS-PR Assessment.[53] Nevertheless, what the Court can gather at this point, from the IRS Transcripts and Certificates of Official Record, is that the bulk of the failure to pay penalties were imposed on or after the IRS-PR's Assessment.[54] Meaning that, any amount owed in connection with the IRS-PR's Assessment must have triggered the failure to pay penalty pursuant to § 6651(a)(3) instead of the failure to pay penalty

---

[53] It is worth mentioning that the IRS Transcripts and Certificates of Official Record also refer to the issuance of notices of lien, notices of intent to levy and other collection attempts after the February 8, 2010 assessment. *See* Docket No. 102-19 and 105-6 – 105-8. Likewise, it is important to note that, a notice of intent to levy, entails that the monthly rate of the failure to pay penalty doubles to one percent. *See* 26 U.S.C.A. § 6651(d).

[54] More importantly, substantial failure to pay penalties were announced in the Updated Notice of Intent to Levy which was sent to Plaintiffs after their failure to pay the amounts demanded in the Notice of Intent to Levy. *See* UF ¶¶ 56-57, 60-61.

under § 6651(a)(2). As such, for the Court to entertain Plaintiffs' request for refund, the "reasonable cause" which would show why Plaintiffs were allegedly precluded from paying the tax liability owed in light of the IRS-PR's Assessment, must have existed during the prescribed payment due date as specified on any notice and demand for payment.

Given the Parties' reliance on § 6651(a)(2) instead of § 6651(a)(3) and the need for further development as to the factual record surrounding the imposition of the penalties, *e.g.* notices and demands made for payment of the tax liability, the Court **DENIES** the Government's Motion for Summary Judgment and Plaintiffs' Partial Motion for Summary Judgment as to Count I.

### ii. Count II: Refund in Connection with Personal Services

Only the Government moves for summary disposition as to Count II.[55] The Government's Motion for Summary

---

[55] In doing so, the Government merged its discussion regarding its request for the dismissal of Count III. However, the Court has opted to discuss the Government's request separately even though at times it was difficult to

Judgment adheres to the rationale employed by the IRS when it completed the audit of Plaintiffs' tax returns for the Tax Years and throughout the entire administrative process. Specifically, the Government posits, that the Bout Agreements remunerated Plaintiff Cotto-Vázquez solely for fighting[56] and because the Bouts took place in the United States, all income earned in connection with the Bout Agreements was adequately characterized as United States source income. *See* Docket No. 105-1 at pgs. 5-11.

Plaintiffs counter that the Bout Agreements compensated Plaintiff Cotto-Vázquez for additional personal services in addition to boxing. *See* Docket No. 122. Along this line, Plaintiffs posit that the Bout Agreements also compensated

---

discern between the Government's arguments as to Count II and Count III.

[56] The Government's Proposed DSUMF ¶ 15 reads as follows: "In 2005 through 2008, the amounts earned by [Plaintiff Cotto-Vázquez], as reflected in the bout agreements, were solely for compensation to fight." The Court did not include Proposed DSUMF ¶ 15 in its Uncontested Facts, for as explained in this section, and in view of the facts currently before this Court, whether Plaintiffs were solely compensated for fighting is a contested material fact.

Plaintiff Cotto-Vázquez for the training that he undertook to be adequately prepared for each Bout in addition to promotional services that he purportedly carried out in order to advertise the Bouts.[57] *Id.* at pgs. 2-3. Additionally, Plaintiffs sustain that, because some of the training and promotional services were done in Puerto Rico, an amount of the compensation earmarked for training and promotional services should be characterized as Puerto Rico source income instead of entirely United States source income. *Id.* at pgs. 2-6.

The Government supports its overarching argument that Plaintiff Cotto-Vázquez was solely compensated to fight on three different fronts. First, the Government points to the Bout Agreements in order to single out the compensation that Plaintiff Cotto-Vázquez received as listed under the subsection identified as "Purse". *See* Docket No. 105-1 at pgs. 8-10; UF ¶¶ 9-16. The Government also points to provisions

---

[57] Plaintiffs also aver that the Bout Agreements compensated Plaintiff Cotto-Vázquez for the sale or licensing of certain intangible property rights, to wit, his name and likeness. The Court will address such claims under its discussion regarding Count III.

of the Bout Agreements which stated that if the Bouts were
cancelled Plaintiff Cotto-Vázquez would not get paid even
the amounts—if any—that he was advanced prior to the
Bouts. *Id.*; UF ¶¶ 18-21.

Second, the Government turns to the deposition testimony
of Mr. Robert Arum ("Mr. Arum")—TR's CEO—Plaintiff
Cotto-Vázquez and Mr. Cotto Sr.  The deposition testimony
offered by Mr. Arum which was cited and quoted in the
Government's Motion for Summary Judgment and in support
of its proposed DSUMF ¶ 15, highlights Mr. Arum's
understanding that Plaintiff Cotto-Vázquez was
compensated to fight[58] and that a fighter earns a "Purse" for
fighting, therefore, if the Bout did not take place, Plaintiff
Cotto-Vázquez would not be compensated. *See* Docket No.

---

[58] The Court will further address this point in its discussion regarding
Count III, however, here, it is also worth noting that the Government's
Motion for Summary Judgment cherry picked Mr. Arum's deposition
testimony in such a way that it solely quoted the portion of the sentence
which states that Plaintiff Cotto-Vázquez was paid to fight. *See* Docket No.
105-1 at pg. 10. However, the Government omits the rest of the sentence
which—read as a whole—reveals Mr. Arum's assertion that Plaintiff
Cotto-Vázquez was paid to fight and for TR to be able to exploit his rights
in connection with the Bouts. *See* Docket No. 107-1 at 28:2-4.

105-1 at pg. 10. Regarding Plaintiff Cotto-Vázquez's deposition testimony, the Government cites and quotes his assertion that he was always aware of the amount that he was "fighting" for. *Id*. As for the deposition testimony of Mr. Cotto Sr., the Government notes his understanding that the "Purse" entailed the compensation given to a fighter for each Bout and that Plaintiff Cotto-Vázquez would not be compensated for the Bout by TR if the Bout was cancelled. *Id.* Lastly, the Government points to its designated boxing industry expert, Mr. James Thomas, who defined the term "Purse" as the compensation provided to a fighter for each Bout. *Id.* at pg. 11.

The Government recognizes that several of the Bout Agreements included "monies" for training expenses, signing bonuses and victory bonuses. *Id.* at pg. 10. Nevertheless, the Government justifies such inclusions in the Bout Agreements as payments that, at the end of the day, were ultimately tied to the Bouts. *Id.* The Government thus focuses its argument in underlining the fact that each Bout Agreement—under the "Compensation" section—included a designated amount for

the "Purse" that Plaintiff Cotto-Vázquez would receive. Plaintiffs have not denied this, and the clear text of the Bout Agreements leave no room for doubt as to the existence of such compensation. But an integral reading of the Bout Agreements reveals that, the majority of the Bout Agreements, included specific amounts earmarked for training expenses and promotional services under the "Compensation" section of the Bout Agreements in addition to the compensation under the "Purse". *See* UF ¶¶ 9-16. Moreover, the Bout Agreements included a "Publicity and Promotion" provision which demanded that Plaintiff Cotto-Vázquez publicize, advertise and promote the Bouts as specified by TR. *See* UF ¶ 17.

The Government's Motion for Summary Judgment also stands for the proposition that even if the Bout Agreements included "monies" for activities other than fighting, Plaintiffs are unable to demonstrate that any of those "monies" should be characterized as Puerto Rico source income. *See* Docket No. 105-1 at pg. 10. Indeed, the Bout Agreements do not specify where Plaintiff Cotto-Vázquez was to train or comply with his

promotional duties. And making such a distinction is important for it directly affects how the compensation is to be characterized, for on the one hand, labor or personal services performed solely within the United States are generally categorized as United States source income. *See* 26 U.S.C.A. § 861(a)(3). On the other hand, Treasury Regulation 26 C.F.R. § 1.861-4(b)(2) states the following:

> [I]n the case of compensation for labor or personal services performed partly within and partly without the United States by an individual, the part of such compensation that is attributable to the labor or personal services performed within the United States, and that is therefore included in gross income as income from sources within the United States, is determined on the basis that most correctly reflects the proper source of that income under the facts and circumstances of the particular case. In many cases, the facts and circumstances will be such that an apportionment on a time basis, as defined in paragraph (b)(2)(ii)(E) of this section, will be acceptable.

26 C.F.R. § 1.861-4(b)(2).[59]

In order to challenge the Government's argument Plaintiffs' Partial Motion for Summary Judgment cites and quotes Mr. Arum's deposition testimony, which reveals that when a Bout was to take place, journalists would travel to Puerto Rico to interview Plaintiff Cotto-Vázquez and watch him train there. *See* Docket No. 122 at pg. 5. While not definitive as to the amount of training and interviews—along with any other promotional tasks—done in Puerto Rico in connection with the Bout Agreements, Mr. Arum's deposition testimony—an individual with personal knowledge regarding the "ins and outs" of Plaintiff Cotto-Vázquez's relationship with TR—is adequate, considering the facts currently before this Court, to preclude the entry of summary judgment in favor of the Government. The reason being that, Mr. Arum's deposition testimony challenges the Government's assertion that none of the services

---

[59] As pointed out by Plaintiffs, the Court acknowledges that the provision addressing labor and services performed by artists and athletes is marked as "Reserved". *See* 26 C.F.R. § 1.861-4(b)(2)(ii)(C)(3).

contemplated in the Bout Agreements were carried out in
Puerto Rico. While today the Court is not ruling as to how this
compensation is to be characterized—whether it is United
States or Puerto Rico source income—Mr. Arum's deposition
testimony opens the door for the income earmarked in the
Bout Agreements for training and promotional services to be
potentially characterized, in part, as Puerto Rico source
income, instead of entirely United States source income. In
short, the compensation allotted for training and promotional
services in the Bout Agreements reveal that certain
compensation, in addition to the amount designated for the
actual fighting that would take place on the day of the Bout,
was contemplated therein. Further, Mr. Arum's deposition
testimony indicates that certain training and promotional
activities took place in Puerto Rico.

Lastly, the Court acknowledges the Government's
reliance on the First Circuit's decision in *Muskat v. United
States*, 554 F.3d 183 (1st Cir. 2009). The Government points to
*Muskat* for in the Amended Complaint, *see* Docket No. 26 at
pgs. 19-20, Plaintiffs argue that a portion of the compensation

listed under the "Purse" provision of the Bout Agreements should be allocated as compensation for the fulfillment of Plaintiff Cotto-Vázquez's duties to promote and publicize the Bouts. *See* Docket No. 105-1 at pg. 7.[60] In *Muskat*, the First Circuit reaffirmed the validity of the "strong proof rule" whereby a party wishing "to alter the written allocation for tax purposes on the basis that the sums were in reality, intended as compensation for some other item[,]" must adduce "that, at the time of execution of the instrument, the contracting parties actually intended the payments to compensate for something different." 554 F.3d at 188-89. The "strong proof rule" is therefore a rule that drives at the contracting parties' intentions. *See Harvey Radio Labs., Inc. v. Comm'r*, 470 F.2d 118, 120 (1st Cir. 1972).

The Government avers that Plaintiffs have not adduced "strong proof" demonstrating that a reallocation of the compensation designated under "Purse" for the

---

[60] Plaintiffs also argue—as further expanded upon in the Court's discussion of the Government's Motion to Exclude—that compensation for personal services that were not earmarked in the Bout Agreements should be compensated by virtue of the "Purse".

compensation of personal services such as the promotion and advertisement of the Bouts is warranted. *See* Docket No. 105-1 at pg. 7. In their Opposition to the Government's Motion for Summary Judgment, Plaintiffs once again cite to the deposition testimony of Mr. Arum. *See* Docket No. 122 pg. 4. Upon being asked whether Plaintiff Cotto-Vázquez was compensated for publicizing and advertising the Bouts, Mr. Arum answered in the affirmative. *Id.* The Court finds that the "strong proof rule" is applicable to this case to the extent that Plaintiffs seek a reallocation of the compensation as delineated in the Bout Agreements. Nevertheless, being that the "strong proof rule" is one of "intent" and in view of the conflicting testimony regarding Plaintiff Cotto-Vázquez's compensation as outlined in the Bout Agreements the Court **DENIES** the Government's Motion for Summary Judgment as to Count II.

### iii. Count III: Refund in Connection with Plaintiff Cotto-Vázquez's Intangible Property Rights

Both the Government and Plaintiffs move for summary judgment as to Count III. While the Government's Motion for

Summary Judgment seeks the dismissal of Count III in its totality, Plaintiffs' Partial Motion for Summary Judgment is limited to a request for the issuance of a partial judgment from this Court stating that the Bout Agreements, *inter alia*, compensated Plaintiff Cotto-Vázquez for "the exclusive use by TR at perpetuity of [his] personal property and intangible rights." *See* Docket No. 101 at pg. 15. The specificity of said request is noteworthy because in the Amended Complaint, under Count III, Plaintiffs move the Court to allocate a portion of the compensation identified as the "Purse" provision in the Bout Agreements to the sale of his intangible property rights, *i.e.*, his name and likeness, as described in the Ancillary Rights. *See* Docket No. 26 at pg. 22. Specifically, Plaintiffs propose that 25% of the "Purse" be "earmarked for the gain from the sale of [Plaintiff Cotto-Vázquez's] intangible property rights." *Id*. In the alternative, Plaintiffs ask that the grant of Plaintiff Cotto Vázquez's intangible property rights be considered a license and therefore request that $379,761.21 of the allegedly overpaid taxes be allocated as income earned for the licensing of his brand, image, name and likeness in

Puerto Rico. *Id.* at pgs. 22-23. Under both scenarios, Plaintiffs contend that a portion of the gains from the exploitation of said rights should be characterized as Puerto Rico source income. *Id.*

Bearing in mind the aforementioned explanation, as the Court reads the Partial Motion for Summary Judgment, Plaintiffs are not moving for the entry of summary judgment of their request for refund as articulated in Count III of the Amended Complaint, but rather, they move for the Court to determine that the Bout Agreements contemplated certain compensation in view of the alleged **sale** of Plaintiff Cotto-Vázquez's intangible property rights to TR in perpetuity.[61] As a result, the Court first examines Plaintiffs' Partial MSJ before

---

[61] Plaintiffs' request did not use the word "sale", however, the arguments raised in their Partial Motion for Summary Judgment rely on the legal theory that the purported compensation received in exchange for the grant of the Ancillary Rights was due to a "sale". *See* Docket No. 101 at pgs. 11-15. Hence why the Court summarized Plaintiffs' request the way that it did. The Court also points out that in their Partial Motion for Summary Judgment, Plaintiffs did not expand upon their "in the alternative" argument, as raised in the Amended Complaint, addressing the possibility that the conveyance of Plaintiff Cotto-Vázquez's intangible property rights could be construed as the granting of a license.

turning to the Government's Motion for Summary Judgment.

The Government opposes Plaintiffs' request on several grounds. First, as consistently argued throughout their briefs before this Court, the Government remains steadfast that the Bout Agreements only compensated Plaintiff Cotto-Vázquez for fighting and nothing more. *See* Docket No. 124 at pgs. 16-18. Second, it argues that Plaintiffs are unable to prove that the Bout Agreements included the sale of Plaintiff Cotto-Vázquez's intangible property rights to TR. *Id.* at pgs. 18-21. Lastly, the Government contends that if this Court were to find that the Bout Agreements contemplated certain compensation in exchange for the grant of Plaintiff Cotto-Vázquez's intangible property rights, said conveyance must be considered a license, such that that any income earned—characterized as royalties—should be deemed as exclusively United States source income. *Id.* at pgs. 21-25.

As discussed *supra*, Plaintiffs' Partial Motion for Summary Judgment does not seek the entry of judgment as to the refund for the alleged overpayment of taxes as detailed in Count III. The issue raised in said motion turns on whether the Bout

Agreements included compensation for the **<u>sale</u>** of Plaintiff Cotto-Vázquez's intangible property rights. While the Government's Opposition counters that the Bout Agreements did not provide for such sale, and that in any event, if the Court were to find that compensation was contemplated in exchange for the grant of Plaintiff Cotto-Vázquez's intangible property rights, such conveyance was in the form of a license, the Court is of the opinion that, at this time, this matter is not ripe for disposition and requires that the record be further developed. The Court therefore **DENIES** Plaintiffs' Partial Motion for Summary Judgment requesting the issuance of a partial judgment stating that the Bout Agreements included compensation for the **<u>sale</u>** of Plaintiff Cotto-Vázquez's intangible property rights.

For its part, the Government's Motion for Summary Judgment rehashes the argument that the Bout Agreements compensated Plaintiff Cotto-Vázquez solely for fighting while relying on the same grounds iterated above as to why Count II of Plaintiffs' Amended Complaint should be dismissed. *See* Docket No. 105-1 at pgs. 5-11. In turn,

Plaintiffs' Opposition focuses on Mr. Arum's deposition testimony whereby he states that the Bout Agreements exclusively conveyed to TR, Plaintiff Cotto-Vázquez's intangible property rights as detailed in the Ancillary Rights, in perpetuity. Docket No. 122 at pg. 3. Plaintiffs also rely on another excerpt from Mr. Arum's deposition testimony whereby he appears to indicate that while no payment was earmarked for the conveyance of the Ancillary Rights, the compensation was lumped. *Id.* at pg. 4.

The Government once again turns to *Muskat, supra,* in order to argue that Plaintiffs have not adduced "strong proof" demonstrating that any of the compensation outlined—let alone the compensation listed under the "Purse" provision—in the Bout Agreements should be reallocated as compensation for the grant of Plaintiff Cotto-Vázquez's intangible property rights. *See* Docket No. 105-1 at pg. 7-8. The Court recognized the applicability of the "strong proof rule" in its discussion as to Count II to the extent that a reallocation is sought, and it does so once again as to Count III. However, here, contrary to the Court's analysis as to Count II whereby

the Court was able to identify specific compensation which had been earmarked for certain personal services, the Bout Agreements do not show that a specific compensation was allotted for Plaintiff Cotto-Vázquez's grant to TR of his intangible property rights as described in the Ancillary Rights provision. The introductory paragraph of the subdivisions identified as "Compensation" in each Bout Agreement, does state, however, that:

> As full and complete compensation for the rights herein granted to TR and for the services and performances required of and to be rendered by [Plaintiff Cotto-Vázquez] herein and on condition that the Bout is completed in accordance with and subject to the provisions hereof and of the applicable standard boxing contract to be signed as provided herein, TR shall pay to [Plaintiff Cotto-Vázquez ] . . ."

*See* UF ¶ 9; *see also* Docket Nos. 102-5 ¶ 4(a) - 102-12 ¶ 4(a); 104-1 ¶ 4(a) - 104-8 ¶ 4(a).

The aforementioned subdivision does not specify the nature of the "rights" alluded to, however, Plaintiffs' contention throughout the instant case has been that said

"rights" include the Ancillary Rights, meaning, Plaintiff Cotto-Vázquez's intangible property rights. And the clear text of the Ancillary Rights provision featured in all eight Bout Agreements establishes that said rights were granted to TR by way of the Bout Agreements. Moreover, Mr. Arum's deposition testimony, as quoted and cited by the Government—which the Court underscores was selectively quoted by the Government, for only the beginning of the sentence stating that Plaintiff Cotto-Vázquez was compensated to fight was included—happened to reveal that Plaintiff Cotto-Vázquez was also compensated for TR to be able to exploit the rights to his fights. *See* Docket No. 105-1 at pg. 10.

Akin to the Court's analysis as to Count II, the Court deems that an integral reading of the Bout Agreements coupled with Mr. Arum's acknowledgement that Plaintiff Cotto-Vázquez was compensated for fighting and for TR to be able to exploit the rights to his fights, challenge the Government's proposed fact at DSUMF ¶ 15 that Plaintiff Cotto-Vázquez was solely compensated for fighting.

Furthermore, Mr. Arum's deposition testimony, whereby he states that compensation for the grant of Plaintiff Cotto-Vázquez's grant of intangible property rights was all "lumped together"[62], appears to, at the very least, raise an issue of fact as to the contractual parties' intentions regarding the compensation that Plaintiff Cotto-Vázquez's received in connection with the Bout Agreements and whether a reallocation is warranted. *See* Docket No. 122 at pg. 4. As such, at this time, the Court **DENIES** the Government's Motion for Summary Judgment as to Count III.

## III. Motion to Exclude

### A. Background

The Government moves for the exclusion of Mr. Misey's expert report and testimony on the grounds that the same constitute a legal opinion "thinly veiled as expert testimony", for he merely applies his interpretation of the law to the facts in order to reach a legal conclusion as to how the Agreement

---

[62] The cited and quoted excerpt of Mr. Arum's deposition testimony referred solely to the Abdullaev Bout, however, the Court finds that, at this stage, the same raises an issue of material fact as to the contracting parties' intentions as to all of the Bout Agreements.

Income should be characterized. Docket Nos. 98 at pg. 1 and 98-1 at pgs. 6-7. The Government also avers that Mr. Misey is not qualified to issue an opinion on the questions of fact at the center of the instant suit which require particular knowledge as to the practices and customs of the boxing industry and intellectual property. *See* Docket No. 98-1 at pgs. 2, 7-9. Specifically, the Government reasons that, the factual question before the Court entails the identification of the items or services that the Bout Agreements purportedly compensated Plaintiff Cotto-Vázquez for and not whether the Agreement Income should be characterized as United States or Puerto Rico source income, for the latter is a legal question that falls squarely within the Court's domain. *Id*.

For their part, Plaintiffs reject the Government's categorization that Mr. Misey's expert report and proposed testimony constitute a legal opinion. Docket No. 116 at pgs. 1-3, 8. According to Plaintiffs, Mr. Misey's expert report and testimony are being proffered as a reasonable methodology to determine how the Agreement Income should be characterized. Docket No. 116 at pgs. 1-2. Plaintiffs further

contend that Mr. Misey's testimony and expert report are of essence given the "vagueness and lack of guidance of the IRC and Treasury Regulations as to the applicable allocation method for professional athletes with compensation partly within and partly without the [United States]." *Id.* at pg. 9. As such, Plaintiffs stress that Mr. Misey will assist the Court in determining a "reasonable allocation method of the compensation paid to [Plaintiff Cotto-Vázquez][.]" *Id.* at pg. 15. Moreover, in order to deny the Government's proposition that Mr. Misey is not qualified to render an expert opinion in this suit, Plaintiffs point to his experience as a litigator, law professor and consultant on matters pertaining to the characterization of income streams and the taxation of international athletes. *Id.* at pgs. 11-15.

The Government's Reply reiterates the arguments raised in its Motion to Exclude. Docket No. 117-1.[63] To wit, that legal

---

[63] The Court has cited to the Reply tendered at Docket No. 117-1. On February 1, 2021, the Court granted the Government's Motion for Leave to File its Reply and stated that "[t]endered reply brief deemed filed." *See* Docket No. 129. However, the Government proceeded to file the same separately the next day. *See* Docket No. 130.

opinions do not assist the Court, for legal matters fall exclusively within the province of the Court. The Government also uses its Reply to distinguish the case law cited by Plaintiffs in their Opposition and to further stress that, whether the Agreement Income is to be characterized as United States or Puerto Rico source income, is a question of law, and not of fact. *Id.*

After having examined the parties' briefs and documents attached thereto, the Court finds that it can rule on the Government's Motion to Exclude without a hearing.

### B. Analysis

At the outset of his expert report, Mr. Misey states that he was asked by Plaintiffs to render an opinion "as to whether the payments received by [Plaintiff Cotto-Vázquez] were in the nature of US –source income or Puerto Rico source excluded income under the [IRC]." *See* Docket No. 100-1 at pg. 1. The Court finds that an expert report and testimony which drive at answering the aforesaid question defeat the purpose of Federal Rule of Evidence 702 ("Rule 702"). Said rule is "[t]he touchstone for the admission of expert testimony

in federal court litigation[.]" *Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007). Rule 702 provides in pertinent part that an expert may testify in the form of an opinion if:

> (a)     The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;
> (c)     the testimony is the product of reliable principles and methods; and
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702.

In their Opposition, Plaintiffs inform the Court that Mr. Misey's testimony and expert report are proffered to show the Court a "reasonable methodology based on the facts and circumstances of the instant case . . . in the determination of the ultimate 'fact' at issue, namely, the characterization of each of the income streams comprising the lump sum income generated by [Plaintiff Cotto-Vázquez] under each of the [Bout Agreements] and determining its sourcing within the

United States and/or Puerto Rico." Docket No. 116 at pgs. 1-2. Plaintiffs' explanation loosely paraphrases Mr. Misey's opening statement in his expert report whereby he leaves no room for doubt as to the purposes of this expert report and the question that he seeks to answer throughout the same. As such, Plaintiffs miss the mark when they characterize Mr. Misey's task as addressing an "issue of fact", for the question that Mr. Misey answers by way of his expert report is a question of law. An answer to said question does not assist the trier of fact as Rule 702 intends. *See Pérez-García v. Puerto Rico Ports Authority*, 873 F. Supp.2d 435, 441-42 (D.P.R. 2012) (citing the Advisory Committee note that accompanies Federal Rule of Evidence 704 in support of the proposition that "[o]pinions that merely tell the jury what result to reach should be deemed inadmissible under Rules 701, 702 and 403.").

Moreover, in reaching a determination regarding the admission or exclusion of a proposed expert opinion, the Court is tasked with evaluating whether the "expert is sufficiently qualified to provide the expert testimony that is

relevant to the task at hand and to ensure that the testimony rests on a reliable basis." *Baudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25 (1st Cir. 2006) (citations omitted). Here, Plaintiffs have pointed to Mr. Misey's expertise in matters pertaining to international tax law and the characterization of income streams. The Court does not turn a blind eye to Mr. Misey's qualifications and expertise. Nevertheless, such qualifications do not shed light on the questions of fact that are presently before this Court.

Assuming *arguendo* that Mr. Misey satisfied the requirements of Rule 702, Mr. Misey's expert report ultimately renders a legal conclusion and therefore oversteps the bounds of what constitutes permissible expert testimony under Federal Rule of Evidence 704 ("Rule 704"). Rule 704 permits expert testimony that tackles the "ultimate issue" of a case. *See* Fed. R. Evid. 704(a).[64] However, the "ultimate issue" under Rule 704 pertains to issues of fact which, at the

---

[64] Rule 704(a) reads as follows: "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).

end of the day, are decided by the jury. *Nieves-Villanueva v. Soto-Rivera,* 133 F.3d 92, 99-100 (1st Cir. 1997). The "ultimate issue" that Rule 704 refers to, does not, however, permit expert testimony that proffers legal conclusions. *Id.*

In a section titled "Discussion", Mr. Misey spends considerable ink discussing legal statutes, IRS regulations and opinions in addition to case law regarding the sourcing of income streams, which the Court highlights have, for the most part, already been referenced by Plaintiffs in their respective legal briefs before this Court.[65] In this same section, Mr. Misey concludes that the Agreement Income should be allocated between personal services and the sale of intangible property rights. He also offers a legal opinion regarding the contractual interpretation of the Bout Agreements while also concluding that the Bout Agreements provided for the sale of Plaintiff Cotto-Vázquez's intangible property rights. The "Discussion"

---

[65] The Court also points out that, the third and fourth pages of the expert report track certain sections of Plaintiffs' Amended Complaint at Docket Number 26. *See* Docket No. 100-1 at pgs. 3-4.

section of Mr. Misey's report mirrors a legal brief, not an expert report.

A section titled "Fight Analysis" follows the "Discussion" section of Mr. Misey's report. Prior to addressing this section, it is important to recapitulate the central arguments at play in this case in order to further illustrate why the Court is precluded from admitting Mr. Misey's expert report. As outlined in the Court's discussion regarding Counts II and III, in their Amended Complaint, Plaintiffs seek to alter the tax liability assessed in view of the IRS-PR's Assessment—whereby the entire Agreement Income was deemed United States source income—such that some of the Agreement Income is re-characterized as Puerto Rico source income. As noted repeatedly throughout this Opinion and Order, the Government contends that the Bout Agreements solely paid Plaintiff Cotto-Vázquez to fight. Meanwhile, Plaintiffs' aver that the Bout Agreements contained earmarked compensation for certain personal services in addition to fighting. Now, as for the purported compensation that was not earmarked in the Bout Agreements—which per Plaintiffs'

legal theory includes some personal services and the totality of the purported sale or licensing of the intangible property rights—Plaintiffs seek to reallocate certain amounts of the compensation listed under the "Purse" provision of the Bout Agreements for the payment of the same.

In order for the reallocation to proceed, the Court specified that Plaintiffs need to show "strong proof"[66], regarding the contractual parties' intent to compensate Plaintiff Cotto-Vázquez for the personal services—in addition to fighting—and the sale—or licensing—of his intangible property rights. If such showing is achieved, then the allocation may proceed. Indeed, the Court is allowed to consider as much testimony as it needs in order to attain an approximate estimate of the amount of compensation that is to be ascribed if the allocation between personal services and the sale—or licensing—of Plaintiff Cotto-Vázquez's intangible property rights is

---

[66] This "strong proof" refers to the "strong proof" as noted in *Muskat*, 554 F.3d at 188-89 and as referenced in the Court's discussion as to Counts II and III.

warranted. Nevertheless, the Court does not find that Mr. Misey's expert report falls within the purview of the testimony necessary to achieve such estimation or that calls for such allocation in the first place.

After the "Discussion" section—which banks on the same legal precepts that the Court is privy to—Mr. Misey, in the "Fight Analysis" section, proceeds to determine the sourcing as to what Plaintiffs identify as the already earmarked compensation for certain personal services in the Bout Agreements as either United States or Puerto Rico source income. *See* Docket No. 100-1 at pgs. 11-25. Mr. Misey then reallocates specific compensation from the compensation listed under the "Purse" provision of each Bout Agreement to certain personal services and for the sale of the intangible property rights which had not been earmarked with a specific compensation in the Bout Agreements. *Id.* In doing so, Mr. Misey ends up concluding which compensation is to be characterized as United States or Puerto Rico source income. *Id.* The Court finds that Mr. Misey's expert report renders a legal conclusion as to the nature of the Agreement Income.

Considerable leeway is afforded to the Court when it is faced with the task of admitting or excluding expert opinions. *See Crowe*, 506 F.3d at 16. Mr. Misey's testimony and expert report usurps the Court's role by reaching a legal conclusion in this case. Plaintiffs' Opposition is not enough to persuade the Court to stray from the precept which reigns in the First Circuit sanctioning the exclusion of legal opinions proffered by designated experts. Accordingly, the Court **GRANTS** the Government's Motion to Exclude.

## IV. Conclusion

In light of the above, at this time, the Court hereby:

- **GRANTS** the Government's Motion to Exclude at Docket Number 98;

- **DENIES** Plaintiffs' Partial Motion for Summary Judgment at Docket Number 101**;**

- **DENIES** the Government's Motion for Summary Judgment at Docket Number 105; and

- **ORDERS** the Parties to file a joint motion, on or before **March 19, 2021**, proposing three dates to hold a status conference.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 11th day of March 2021.

        S/SILVIA L. CARRENO-COLL
        UNITED STATES DISTRICT COURT JUDGE